HEURTEBISE v RELIABLE BUSINESS COMPUTERS, INC

Docket No. 102019. Argued April 10, 1996 (Calendar No. 5). Decided July 16, 1996. Rehearing denied 453 Mich 1204.

Theresa Heurtebise brought an action in the Wayne Circuit Court against Reliable Business Computers, Inc., alleging unlawful termination of her employment because of gender discrimination in violation of the Civil Rights Act, MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.* The court, Cynthia D. Stephens, J., denied the defendant's motion to compel arbitration and to stay the proceedings, finding that the arbitration agreement signed by the plaintiff was against public policy. The Court of Appeals, NEFF, P.J., and McDONALD and M. WARSHAWSKY, JJ., reversed in an opinion per curiam, finding no public policy prohibition against the enforcement of a valid arbitration agreement that provides for meaningful arbitration in matters involving civil rights questions, and determined that arbitration does not impair the remedies afforded under the statute (Docket No. 152041). The plaintiff appeals.

In separate opinions, the Supreme Court unanimously *held*:

An arbitration provision is unenforceable if it is not a binding contract. The opening statement of the defendant's handbook demonstrates that the defendant did not intend to be bound to any provision contained in the handbook. Consequently, the handbook did not create an enforceable arbitration agreement with respect to this dispute. Thus, the defendant was not entitled to summary disposition.

Justice CAVANAGH, joined by Justices LEVIN and MALLETT, additionally stated that the Michigan Constitution and longstanding public policy preclude private employers from requiring their employees, as a condition of employment, to waive prospectively the right to pursue civil rights claims in a judicial forum.

Rights secured by the Michigan Civil Rights Act are nonnegotiable state rights that apply to all employees and cannot be waived or conditioned. The Michigan Constitution expressly prohibits exhaustion of administrative remedies for civil rights claims. In addition, the Legislature has underscored this policy by expressly prohibiting an exhaustion of administrative remedies requirement. In creating the Civil Rights Commission, Const 1963, art 5, § 29 did

not diminish the right of any party to direct and immediate legal or equitable remedies in the courts, and it was intended that the role of the judiciary in enforcing civil rights was to remain supreme. As the scope of equal protection expanded, the private right to judicial remedies, whether expressly provided by statute or inferred by the judiciary, was always included. The Legislature has done nothing to impair or restrict an aggrieved person's access to judicial remedies, nor could it.

The judicial remedies provision of Const 1963, art 5, § 29, along with the tone of the constitutional debates that produced the provision, reveal that an aggrieved person's direct access to a judicial forum is so interwoven with the enforcement of substantive civil rights in Michigan that they cannot be separated without potentially harming substantive civil rights. Public policy favoring arbitration can be outweighed by contrary constitutional or legislative intent.

Reversed and remanded.

207 Mich App 308; 523 NW2d 904 (1994) reversed.

*Goodman, Eden, Millender & Bedrosian* (by *Christopher R. Holliday* and *Julia Sherwin*) for the plaintiff.

*Shapack, McCullough & Kanter, P.C.* (by *Alan M. Kanter, Michael R. Shpiece,* and *Michael L. Geller*), and *Walton & Stafford, P.C.* (by *Jonathan T. Walton, Jr.,* and *Laura S. Stafford*), for the defendant.

Amici Curiae:

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Rebekah F. Visconti,* Assistant Attorney General, for Michigan Civil Rights Commission and Michigan Department of Civil Rights.

*Stewart R. Hakola* and *Gayle C. Rosen* for the Michigan Protection & Advocacy Service.

*Sachs, Waldman, O'Hare, Helveston, Bogas & McIntosh, P.C.* (by *Mary Katherine Norton* and *Elizabeth A. Cabot*), for Michigan State AFL-CIO, Interna-

tional Union UAW, National Employment Lawyers Association, and Michigan Employment Lawyers Association.

*Jeanne M. VanderHeide* and *Jeanne Mirer* for National Lawyers Guild, Detroit Chapter.

*Stark & Gordon* (by *Sheldon J. Stark* and *Carol A. Laughbaum*) for the Association of Trial Lawyers of America, Michigan Trial Lawyers Association, American Civil Liberties Union of Michigan, and Wolverine Bar Association.

*Clark, Hill, P.L.C.* (by *Duane L. Tarnacki, J. Walker Henry,* and *Patricia S. Bordman*), for Michigan Manufacturers Association.

*Amberg, McNenly, Zuschlag, Firestone & Lee, P.C.* (by *Joseph H. Firestone*), for Michigan Education Association.

*Vercruysse, Metz & Murray* (by *Diane M. Soubly* and *David B. Calzone*) for American Society of Employers, American Automobile Manufacturers Association, Greater Detroit Chamber of Commerce, and Michigan Chamber of Commerce.

CAVANAGH, J. We are asked in this case to address whether the instant parties have created a binding arbitration agreement with respect to employment discrimination claims accruing subsequent to such an agreement. If yes, then we would need to address whether such agreements between employers and employees, entered into as a condition of employment, violate public policy in Michigan. We hold that no binding agreement was created in this case. Consequently, a majority of this Court declines to address

the second issue. However, I would further hold that the public policy against discrimination in Michigan precludes enforcement of prospective waivers in employment contracts of a judicial forum for civil rights claims. Before turning to the matter at hand, we thank all the amici curiae who filed briefs for assisting us in resolving the issues.

I

This case is at the summary disposition stage. In November 1991, the plaintiff, Theresa Heurtebise, filed suit against the defendant, Reliable Business Computers, alleging that she had been unlawfully terminated from her employment in violation of the Michigan Civil Rights Act. MCL 37.2101 *et seq.*; MSA 3.548(101) *et seq.* The plaintiff alleged that she had been hired in May 1989 to perform computer software support work. She further alleged that she and a co-worker, who was male, often took lunches that lasted longer than the company's established one-hour period, while working together on a project. Additionally, she alleged that on July 20, 1990, the plaintiff and this male co-worker returned from a working lunch that had lasted longer than one hour. The plaintiff alleged that she was terminated, while her male co-worker was not. The plaintiff argued that this was unlawful gender discrimination and sought money damages.

In response, the defendant brought a motion to dismiss, pursuant to MCR 2.116(C)(4) (lack of subject matter jurisdiction), or, alternatively, to compel arbitration and to stay proceedings, pursuant to MCR 3.602. The defendant relied on a written acknowledgment signed by the plaintiff and dated May 25, 1989,

which stated that she had received the defendant's employee handbook and that she had agreed to be bound by its terms and policies.[1] The handbook provided an internal review mechanism for disputes with respect to dismissals.[2] In addition, it provided that all disputes involving money damages would go to final and binding arbitration.[3]

---

[1] The document provided:

I acknowledge receipt of the Reliable Business Computers, Inc. Employee Handbook. I agree to conform to the various procedures, rules and regulations of the company, as set forth therein, and as may be promulgated by the company in the future, and further understand that my employment and compensation can be terminated with, or without cause, and with or without notice at any time, at the option of either me or the company. I further understand that no employee, other than the president or his designee, in a duly executed written document, has any authority to enter into any agreement for employment for any specified period of time, or to make any arrangements contrary to or different from what is provided in this handbook.

[2]  Notwithstanding that employees are employed by the COMPANY "at will" and that an employee's employment may be terminated by the employee or the COMPANY, at any time, (without notice and without cause). An employee who has followed the internal review procedure for review by the Executive Committee, (specified above), and who is not satisfied with the results of the review and who feels compelled to seek redress from a source outside the COMPANY may challenge the propriety of the dismissal outside the COMPANY, only through arbitration as hereinafter described.

Such arbitration shall be the final arena of dispute resolution and the decision of the arbitrator(s) shall be final and binding upon both the COMPANY and the employee.

[3] Section VIII of the handbook provided:

ARBITRATION OF DISPUTES

If any dispute, matter or controversy involving claims of monetary damages and/or employment related matters should arise between an employee and the COMPANY, including, but not limited to, any and all claims relating to termination of employment (regardless of whether or not the employee has exhausted the various mandatory procedures for internal review of complaints and

The trial court denied the defendant's alternative motions. It refused to enforce the arbitration agreement on the grounds that it was against public policy and that other clauses in the handbook made the arbitration provision ambiguous.[4]

The Court of Appeals reversed. 207 Mich App 308; 523 NW2d 904 (1994). It reasoned:

dismissals), then such dispute, matter or controversy shall be referred for binding arbitration under the laws of the State of Michigan to the American Arbitration Association (hereinafter "AAA") under the rules of such AAA, to be decided by a three (3) member arbitration panel, except that the COMPANY, shall have the right to select one arbitrator, the employee shall have the right to select one arbitrator, and the two arbitrators so selected shall select a third arbitrator. A decision or award of the AAA shall be accepted as final and conclusive and shall be binding upon both the employee and the COMPANY . . . . The arbitration proceeding shall afford the COMPANY and the employee with opportunities to present and rebut evidence relative to the applicable issues. Nothing herein relative to arbitration, however, shall prevent either employee or COMPANY from seeking and obtaining equitable relief on a temporary or permanent basis from a court of competent jurisdiction by instituting a legal action or other court proceeding in order to protect or enforce the rights of either or to prevent irreparable harm and injury. However, the court's jurisdiction over any such matter between the COMPANY and the employee shall be expressly limited only to the equitable issues and relief sought, and all issues involving monetary damages between the COMPANY and the employee shall be determined through arbitration as described above.

[4] The court stated from the bench:

This is a situation in which an employer hires an employee and as a condition, in giving that employee . . . employment hands her an employee handbook, and the employee handbook purports to handle any number of things, including providing an internal review process for dismissals. It is an agreement which, if one were to enforce it, would indicate that this employee could not bring an action for anything, including, by the way, [the] whistle blowers act, against this employer without subjecting it to arbitration. That strikes me as if not absurd certainly violative of public policy.

The trial court appears to have denied defendant's motion in part because it found there was no "meeting of the minds" between plaintiff and defendant with regard to the arbitration clause. The record does not support such a finding. Before beginning employment, plaintiff signed an acknowledgment form that stated that she agreed to conform to the various procedures, rules, and regulations of the company as set forth in the handbook. Moreover, even were the record devoid of plaintiff's express acceptance of the handbook's provisions, it is well established under Michigan law that mutual assent to a term of employment is not required. *In re Certified Question*, 432 Mich 438; 443 NW2d 112 (1989); *Carlson v Hutzel Corp of Michigan*, 183 Mich App 508; 455 NW2d 335 (1990); *Toussaint v Blue Cross & Blue Shield of Michigan*, 408 Mich 579; 292 NW2d 880 (1980).[5]

Plaintiff's argument that the handbook specifically states that it does not create an enforceable contract is misguided. The provision plaintiff relies on addresses the at-will nature of plaintiff's employment, not the handbook in its entirety.

Finally, we find no "public policy" prohibition against the enforcement of a valid arbitration agreement that provides for meaningful arbitration in matters involving civil rights questions. See *Gilmer v Interstate/Johnson Lane Corp*, 500 US 20; 111 S Ct 1647; 114 L Ed 2d 26 (1991). To the contrary, arbitration has long been a favorable method of dispute resolution. *Detroit v A W Kutsche & Co*, 309 Mich 700; 16 NW2d 128 (1944). Thus, arbitration clauses are to be liberally construed with any doubts to be resolved in favor of arbitration. *Chippewa Valley Schools v Hill*, 62 Mich App 116; 233 NW2d 208 (1975). Contrary to plaintiff's suggestion, arbitration of plaintiff's claims will not result in the loss of her rights under the Civil Rights Act, but, instead, merely constitutes enforcement of an agreement to have

---

[5] We note that the panel's citation of *In re Certified Question*, which held that an employer could *unilaterally* change a written policy, was misplaced. Assuming arguendo that the Michigan Arbitration Act applies, it provides that neither party to an arbitration agreement can revoke the agreement without the other party's consent. MCL 600.5011; MSA 27A.5011.

those rights determined in a different forum. Arbitration does not impair the remedies afforded under the statute. [207 Mich App 310-311.]

We granted leave to the plaintiff's appeal. 450 Mich 963 (1995). We note that the entire handbook was not presented to the trial court or to the Court of Appeals. After oral argument, we granted the plaintiff's motion to expand the record to include the entire handbook. It is seventy-one pages long and covers a broad scope of subjects.[6] The expanded record reveals that the handbook included an antidiscrimination policy statement.[7] In the introduction on page 2, the handbook further reserved in the

---

[6] The table of contents lists the following headings:

administrative policies, rules and procedures . . . salary and wage levels, promotions and transfers . . . absence from work . . . employee benefits . . . security provisions—non-disclosure of company trade secrets and confidential information . . . company's ownership of inventions and other developments . . . termination and dismissal . . . [and] arbitration of disputes.

[7] On page 4, the handbook provided:

It is the policy of the COMPANY to recruit, hire and promote without regard to physical handicap, race, religion, national origin, sex, age or veteran status. It is also COMPANY policy to require that all other personnel action such as compensation, transfers, COMPANY sponsored training, educational assistance, social and recreational programs, and all employee benefit programs are administered without regard to physical handicap, race, religion, national origin, sex, age or veteran status. It is important that every employee, regardless of status, understand the intent of and comply with this policy. Should you feel that someone has violated this policy, please contact the Chief Operating Officer, or any member of the Executive Committee, immediately.

We note that a contractual provision providing parallel protection against discrimination cannot supplant independent statutory and constitutional rights. *Betty v Brooks & Perkins*, 446 Mich 270, 289; 521 NW2d 518 (1994).

defendant the right to modify any policy contained in the handbook "at its sole discretion."

II

We turn first to whether the parties are bound by a valid arbitration agreement. It is undisputed that an arbitration provision is unenforceable if it is not a binding contract.[8] The opening statement in the handbook provides:

> This document is intended to establish and clarify certain employment policies, practices, rules and regulations (hereinafter collectively referred to as "Policies") of RELIABLE BUSINESS COMPUTERS, INC., (hereinafter referred to as the "COMPANY"). Except as may otherwise be provided, the Policies will apply to all COMPANY employees, and it is each employee's responsibility to assure that his/her own conduct is in conformity with those Policies. *It is important to recognize and clarify that the Policies specified herein do not create any employment or personal contract, express or implied,* nor is it intended nor expected that the information provided in this document will provide sufficient detail to answer any and all questions which may arise. *NOTWITHSTANDING ANY OF THE SPECIFIC POLICIES HEREIN, EACH EMPLOYEE HAS THE ABSOLUTE RIGHT TO TERMINATE HIS/HER OWN EMPLOYMENT AT ANY TIME, WITHOUT NOTICE, AND FOR ANY REASON WHATSOEVER, AND THE COMPANY HAS THE SAME RIGHT.*
>
> From time to time, the COMPANY specifically reserves the right, and may make modifications to any or all of the Policies herein, at its sole discretion, and as future conditions may warrant. In the event employees have any questions relative to any of the Policies, they are urged to contact their supervisor for clarification purposes.

\*     \*     \*

---

[8] 4 Am Jur 2d, Alternative Dispute Resolution, § 70, pp 129-130. Assuming arguendo that the MAA applies, it provides the same contractual requirements. MCL 600.5001(2); MSA 27A.5001(2).

New employees will receive a copy of this document at the time of formal hire. Upon receipt, all employees will sign the Employee Acknowledgement, acknowledging receipt of this document. [Emphasis added.]

This demonstrates that the defendant did not intend to be bound to any provision contained in the handbook. Consequently, we hold that the handbook has not created an enforceable arbitration agreement with respect to this dispute. We note that the above opening statement was not part of the record before the Court of Appeals. Had the Court of Appeals been able to examine the entire handbook, we are confident that it would have reached the same conclusion. We hold that the defendant was not entitled to summary disposition.

III

Although a majority of this Court saves the public policy issue for another day, because the Court of Appeals addressed it, I believe that we should decide it as well. Therefore, I turn now to the issue whether private employers *can* require employees, as a condition of employment, to waive prospectively their right to pursue civil rights claims in a judicial forum.

As I will demonstrate, Michigan has a long history of stalwartly defending individuals from invidious discrimination in their pursuit of basic civil liberties, such as equal opportunity in the pursuit of employment. Unlike federal law, Michigan also has an unwavering history of faithfully defending an aggrieved individual's right to a judicial forum to remedy unlawful discrimination.

The defendant relies on federal title VII and age discrimination (ADEA) case law. However, it is axiomatic

that even under federal law, "an employee may not prospectively waive his or her rights under either Title VII or the ADEA." *Adams v Philip Morris, Inc,* 67 F3d 580, 584 (CA 6, 1995).[9] Likewise, we have held that the rights secured by the Michigan Civil Rights Act are "nonnegotiable state rights." *Betty v Brooks & Perkins,* 446 Mich 270, 282; 521 NW2d 518 (1994). "These are rights that apply to all employees, whether or not they belong to a union. Such rights cannot be waived or conditioned on success at the bargaining table." *Id.* The defendant and its amici curiae would have us believe that the only interest at stake in enforcing a prospective arbitration agreement is the parties' choice of forum in which an aggrieved party may pursue statutory remedies. We should decide whether a prospective waiver of an aggrieved individual's right to a judicial forum, which is required of the employee as a condition of employment, comports with Michigan public policy as reflected in our constitution, civil rights statute, and case law.

The issue before us would be one of first impression. There are several layers of considerations that I will address. First, I will briefly review the prevailing precedent with respect to federal discrimination claims. Second, I will consider whether Michigan civil rights law is substantially similar to federal anti-discrimination law or whether it is materially different with respect to an aggrieved individual's access to a judicial forum. I will then trace the role of an aggrieved individual's access to a judicial forum in the development of Michigan civil rights law to determine

---

[9] See also *Kendall v Watkins,* 998 F2d 848, 851 (CA 10, 1993) ("an employee may agree to waive Title VII rights that have accrued, but cannot waive rights that have not yet accrued").

whether Michigan public policy precludes the enforcement of prospective arbitration agreements in employment contracts with respect to statutory civil rights claims.

## FEDERAL DISCRIMINATION CLAIMS

The Court of Appeals relied on *Gilmer, supra,* in holding that public policy did not prevent the enforcement of a valid prospective arbitration agreement. 207 Mich App 311. In 1991, the *Gilmer* Court held that a broadly worded arbitration clause in a securities registration form, which is often referred to as a stockbroker U-4 form, covered an ADEA claim. In doing so, the Court found that the Federal Arbitration Act (FAA) applied and that it evidenced a " 'liberal federal policy favoring arbitration agreements.' " *Id.* at 25 (citation omitted). However, the FAA expressly excludes from coverage "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 USC 1.[10] Referencing this clause, *Gilmer* expressly did not decide what the result would be if the arbitration clause had been contained in an employment contract. *Id.* at 25, n 2. *Gilmer* also distinguished a trilogy of cases that had arisen in the collective bargaining setting: *Alexander v Gardner-Denver Co,* 415 US 36; 94 S Ct 1011; 39 L Ed 2d 147 (1974) (title VII claim), *Barrentine v Arkansas-Best Freight System, Inc,* 450 US 728; 101 S Ct 1437; 67 L Ed 2d 641 (1981)

---

[10] The courts remain split over the scope of 9 USC 1. See *Williams v Katten, Muchin & Zavis,* 837 F Supp 1430, 1438-1439 (ND Ill, 1993) (listing cases holding that the exclusionary clause is limited to transportation industries' employment contracts and cases holding that the clause extends to all employment contracts); *Fletcher v Kidder, Peabody & Co,* 81 NY2d 623, 637; 601 NYS2d 686; 619 NE2d 998 (1993) (citing cases).

(right to minimum wage claim under the Fair Labor Standards Act), and *McDonald v West Branch*, 466 US 284; 104 S Ct 1799; 80 L Ed 2d 302 (1984) (42 USC 1983 claim).

Following *Gilmer*, there has been a lot of appellate activity involving the applicability of prospective arbitration agreements to federal discrimination claims. Although there remain many unanswered questions in *Gilmer*'s wake, two general rules have emerged. First, an arbitration clause in a collective bargaining agreement does *not* extend to federal statutory claims of discrimination. E.g., *Pike v Burlington Northern R Co*, 273 Mont 390, ___; 903 P2d 1352, 1357 (1995). One overriding rationale for this rule is that civil rights are individual personal rights, while union bargaining representatives act for the benefit of the group. The apparent "tension between collective representation and individual statutory rights" led the Court in the *Alexander* line of cases to protect the rights of the individual employee by not enforcing arbitration agreements in collective bargaining agreements with respect to claims of unlawful discrimination. *Gilmer*, 500 US 35.

The second rule is that an arbitration clause in a stockbroker U-4 form *does* extend to title VII claims, in addition to ADEA claims. *Bender v AG Edwards & Sons, Inc*, 971 F2d 698 (CA 11, 1992); *Alford v Dean Witter Reynolds, Inc (On Remand)*, 939 F2d 229 (CA 5, 1991).

The defendant cites numerous cases for the proposition that prospective arbitration agreements in individual employment contracts have been enforced with respect to federal and state discrimination

claims.[11] However, those cited cases arose under the FAA or were not ordinary employment contracts.[12] I have found other cases that have distinguished the contract at issue, such as a stockbroker U-4 form, as *not* being an employment contract. *Willis v Dean Witter Reynolds, Inc,* 948 F2d 305, 312 (CA 6, 1991); *Alford,* 939 F2d 230, n * ("[c]ourts should be mindful of this potential issue in future cases").[13] On the basis of the fact that the *Gilmer* Court expressly distinguished employment contracts, *id.* at 25, n 2, and because many subsequent cases have continued that distinction, I would find that the cases upholding prospective arbitration agreements in stockbroker U-4 forms, including *Gilmer,* are not on point in the case at hand because they did not concern ordinary

---

[11] In *Mago v Shearson Lehman Hutton, Inc,* 956 F2d 932 (CA 9, 1992), the court assumed that the FAA applied because the employee did not challenge its applicability. Applying the FAA, the court found that a privately negotiated arbitration agreement in an employment application covered a title VII claim. *Id.* at 935. Likewise, in *DiCrisci v Lyndon Guaranty Bank of New York,* 807 F Supp 947 (WD NY, 1992), the court applied the FAA and enforced an arbitration clause in an employment contract with respect to title VII and New York discrimination claims. However, the court reserved the issue of punitive damages under state law for post-arbitration consideration. *Id.* at 953-954. See also *Scott v Farm Family Life Ins Co,* 827 F Supp 76 (D Mass, 1993) (applying the FAA, the court held that an arbitration agreement in an insurance sales agent contract covered title VII and state discrimination claims), and *Hull v NCR Corp,* 826 F Supp 303 (ED Mo, 1993) (applying the FAA, the court enforced an arbitration agreement with respect to title VII, the ADEA, and state discrimination claim).

[12] See *Williams,* n 10 *supra,* 837 F Supp 1438, characterizing a partnership agreement as an employment contract and enforcing a prospective arbitration clause with respect to a title VII claim. See also *Dancu v Coopers & Lybrand,* 778 F Supp 832 (ED Pa, 1991), aff'd 972 F2d 1330 (CA 3, 1992) (partnership agreement).

[13] The defendant has pointed out *Beauchamp v Great West Life Assurance Co,* 918 F Supp 1091 (ED Mich, 1996). However, *Beauchamp* involved a U-4 form, which the court expressly stated was *not* an employment contract. *Id.* at 1094, n 2.

employment contracts.[14] Hence, I would find that there remains a conflict among courts regarding whether arbitration agreements in individually negotiated employment contracts are enforceable under the FAA with respect to claims of unlawful discrimination.

In any event, the defendant has not argued that the instant case is controlled by the FAA. Therefore, even if prospective arbitration agreements in individually negotiated employment contracts are enforceable with respect to federal and other state discrimination claims when the FAA does apply, such cases would not necessarily apply here.[15]

### TITLE VII AND ADEA DISTINGUISHED FROM THE MICHIGAN CIVIL RIGHTS ACT

Even though we often look to title VII precedent in interpreting our own civil rights statute,[16] we decline to do so when the Michigan statute provides greater protection to victims of discriminatory actions than title VII provides.[17] Title VII requires claimants to exhaust administrative remedies with the Equal Employment Opportunity Commission (EEOC) before pursuing judicial relief.[18] Likewise, the ADEA requires

---

[14] There may also be an issue whether the level of sophistication of the employee may factor into the enforceability of an arbitration agreement. See *Asplundh Tree Expert Co v Bates*, 71 F3d 592, 602 (CA 6, 1995) (applying the FAA and noting that "the arbitration clause is contained in an employment contract between a highly paid executive and his corporate employer").

[15] Further, even if the FAA were to apply, it can be surmounted by contrary legislative or constitutional intent. See discussion *infra* at 434-435.

[16] *Radtke v Everett*, 442 Mich 368, 381-382; 501 NW2d 155 (1993).

[17] *Eide v Kelsey-Hayes Co*, 431 Mich 26, 36-38; 427 NW2d 488 (1988).

[18] 42 USC 2000e-5(b), (c), (e).  See *Shannon v Ford Motor Co*, 72 F3d 678, 684 (CA 8, 1996):

In general, "[e]xhaustion of administrative remedies is central to Title VII's statutory scheme because it provides the EEOC the first

an aggrieved individual to seek relief first with the
EEOC.[19] In sharp contrast, the Michigan Constitution
expressly prohibits an exhaustion of administrative
remedies requirement for civil rights claims.[20] In addi-
tion, the Legislature has underscored this policy by
also expressly prohibiting an exhaustion of adminis-
trative remedies requirement.[21] Even if federal prece-
dent had answered the issue at hand with respect to
ordinary individually negotiated employment con-
tracts, and I have found above that it has not, I would
find that the Michigan constitutional and statutory
enforcement scheme for civil rights is significantly
different from the statutory enforcement scheme for
federal discrimination statutes with respect to an
aggrieved individual's access to judicial remedies.
Accordingly, I would decline to rely on federal
precedent.

IV

Although I do not find *Gilmer* to be on point with
respect to the issue at hand, I do find the Court's

---

opportunity to investigate discriminatory practices and enables it
to perform its role of obtaining voluntary compliance and promot-
ing conciliatory efforts." To exhaust her remedies, a Title VII plain-
tiff must timely file her charges with the EEOC and receive, from
the EEOC, a "right to sue" letter. 42 USC 2000e-5(b), (c), (e). The
proper exhaustion of administrative remedies gives the plaintiff a
green light to bring her employment-discrimination claim, along
with allegations that are "like or reasonably related" to that claim,
in federal court. [Citations omitted.]

[19] 29 USC 626(d); *Gilmer*, 500 US 27.

[20] See Const 1963, art 5, § 29.

[21] MCL 37.2803; MSA 3.548(803) provides:

   This act shall not be construed to diminish the right of a person
to direct or immediate legal or equitable remedies in the courts of
this state.

approach to be a suitable starting point. *Gilmer* balanced the public policy in favor of arbitration against the public policy underlying the statutory claim at issue. In doing so, the Court examined the statutory language and congressional intent to determine whether Congress intended " 'to preclude a waiver of judicial remedies for the statutory rights at issue.' " *Gilmer*, 500 US 26 (citation omitted). Similarly, I will consider the legislative intent behind the Michigan Civil Rights Act. But, more importantly, because civil rights received profound consideration by the Michigan Constitutional Convention[22] and preeminent status in the 1963 Constitution itself,[23] I would first consider the people's intent when they adopted the Michigan Constitution.

### PRE-1963 PRIVATE JUDICIAL REMEDIES

To understand what occurred in 1963, it is important to remember what brought us to that point. Michigan was at the forefront in the development of civil rights long before the Civil Rights Act was enacted. Early on, the right to pursue private judicial remedies has been recognized as fundamental to the enforcement of civil rights. *Ferguson v Gies*, 82 Mich 358; 46 NW 718 (1890), was a watershed decision by which Michigan parted company from majority rule. The *Ferguson* Court rejected the "separate but equal" theory six years before the United States Supreme Court adopted it in the infamous *Plessy v Ferguson*, 163 US 537; 16 S Ct 1138; 41 L Ed 256 (1896). More important for us in the instant case is that *Ferguson* held that a black man who had been aggrieved by

---

[22] See 1 Official Record, Constitutional Convention 1961, pp 739-752.

[23] Const 1963, art 1, § 2.

unlawful discrimination had a right to pursue private
judicial relief.

At issue in *Ferguson* was whether a statutory provi-
sion, which penalized racial discrimination as a mis-
demeanor, precluded a separate private civil suit for
damages. The Court held that it did not. The Court
stated:

> The general rule, however, is that where a statute
> imposes upon any person a specific duty for the protection
> or benefit of others, if he neglects or refuses to perform
> such duty, he is liable for any injury or detriment caused by
> such neglect or refusal, if such injury or hurt is of the kind
> which the statute was intended to prevent; nor is it neces-
> sary in such a case as this to declare upon or refer to the
> statute. *The common law as it existed in this State before
> the passage of this statute, and before the colored man
> became a citizen under our Constitution and laws, gave to
> the white man a remedy against any unjust discrimina-
> tion to the citizen in all public places.* It must be consid-
> ered that, when this suit was planted, the colored man,
> *under the common law of this State,* was entitled to the
> same rights and privileges in public places as the white
> man, and he must be treated the same there; and that *his
> right of action for any injury arising from an unjust dis-
> crimination against him is just as perfect and sacred in
> the courts as that of any other citizen.* This statute is only
> declaratory of the common law, as I understand it now to
> exist in this State. [*Id.* at 365 (emphasis added).]

*Ferguson* began to establish that, in Michigan,
whenever a particular equal protection right is recog-
nized, whether by constitution, statute, or common
law, then fused to that right is the right to pursue

judicial relief.[24] In other words, adhering to the substantive right is "a remedy against any unjust discrimination." *Id.* In *Ferguson*, the substantive right recognized was that black men were entitled to equal access to public accommodations.

The right to pursue a private civil action has been reaffirmed many times. Even in the absence of a common-law remedy and in the absence of a statutory remedy, our Court long ago held that there was a private civil remedy for violations of a civil rights statute. *Bolden v Grand Rapids Operating Corp*, 239 Mich 318, 328; 214 NW 241 (1927). In 1944, this Court reaffirmed *Bolden* in *St John v General Motors Corp*, 308 Mich 333, 336; 13 NW2d 840 (1944). *St John* held that a penal statute[25] that prohibited gender wage discrimination included a private civil remedy. "The statute establishes specified personal civil rights and if there has been discrimination between sexes in the instances at bar the remedy by action at law is available to claimants." *Id.*

As the Legislature has expanded the scope of civil rights over the years, the right to pursue judicial remedies has been coupled with the expansion.[26] In 1955,

---

[24] Incidentally, arbitration was a recognized form of dispute resolution long before 1890. See syllabus for *Chicago & Michigan L S R Co v Hughes*, 28 Mich 186 (1873), recapping arbitration principles.

[25] 1919 PA 239, reenacted by 1931 PA 328, § 556 (1940 CL 17115-556; MSA 28.824).

[26] Justice ADAMS recapped the *Ferguson* rule and the Michigan statutory history of civil rights in *Beech Grove Investment Co v Civil Rights Comm*, 380 Mich 405, 434-435; 157 NW2d 213 (1968):

When Gies undertook to conduct a public business, he did so subject to the requirement that the business be carried on without "unjust discrimination." Ferguson's remedy, even though statutorily stated, stemmed from the common law. Ferguson's right was the right not to be discriminated against because of religion, race,

the Fair Employment Practices Act (FEPA) was enacted, which created a civil right to equal opportunity in the pursuit of employment[27] in the private sector, as well as the public sector.[28] *Pompey v General Motors Corp*, 385 Mich 537, 551-552; 189 NW2d 243 (1971), explained that this was the first time that the

---

color or national origin. As a corollary of that right he was entitled to receive the same treatment anyone else would receive—no better, no worse.

\*        \*        \*

The public policy with regard to civil rights in laws enacted by the legislature has been to ban discrimination. It has been summarized in [Cramton,] *The Powers of the Michigan Civil Rights Commission,* [63 Mich L R 5, 25-26 (1964)], as follows . . . :

"Other civil rights relating to racial, religious, and ethnic discrimination have been created by the legislature over the past hundred years. The first civil rights legislation was enacted in 1867; it prohibited racial segregation in public education. In 1869, a statute prohibited life insurance companies that were doing business within the State from making any distinction or discrimination between white and colored persons. The ban against miscegenation was removed in 1883. In 1885, criminal sanctions were provided for denial of equal treatment in public places of accommodation, amusement, and recreation; racial discrimination in the selection and qualification of jurors was prohibited in the same year. The Michigan Supreme Court rejected the 'separate but equal' doctrine in 1890, and held that a civil action for damages could be brought for discriminatory treatment in a public accommodation. The public accommodations statute was strengthened in 1937, 1952, and 1956; the 1952 amendment extended coverage to 'government housing.' Finally, in 1955, the fair employment practices act created 'a civil right' in 'the opportunity to obtain employment without discrimination because of race, color, religion, national origin or ancestry' and established remedies for the enforcement of this right. Domestic help and employers with less than eight employees were excluded from the coverage of the act."

[27] The opportunity to obtain employment without discrimination because of race, color, religion, national origin or ancestry is hereby recognized as and declared to be a civil right. [1955 PA 251, § 1, MCL 423.301; MSA 17.458(1), repealed by 1976 PA 453, § 804 (Michigan Civil Rights Act).]

[28] "Employer" was defined as:

right to be free from unlawful discrimination extended to private employment. Even though the statute did not create a private civil action, *Pompey* held that a statutorily created civil right included a private action for civil damages in addition to any statutory enforcement mechanism. *Id.* at 560. The Court explained:

> In 1955, the fair employment practices act created a civil right in the opportunity to obtain employment without discrimination because of race, color, religion, national origin or ancestry. Defendant contends, and we agree, that prior to the passing of this important legislation in 1955, there was in Michigan no recognized legal remedy for acts of discrimination based on race in private employment. While a right of action was recognized for racial discrimination in public accommodation (*Ferguson v Gies* [1890], 82 Mich 358) and in the enjoyment of various other civil rights, the right to be free from discrimination on account of race in private employment was not rewarded as a civil right entitled to protection of the law.
>
> We recognize that the fact that there was no preexistent common-law remedy for racial discrimination in private employment is generally highly significant in determining the exclusiveness of the statutory remedy. The general rule, in which Michigan is aligned with a strong majority of jurisdictions, is that where a new right is created or a new duty is imposed by statute, the remedy provided for enforcement of that right by the statute for its violation and nonperformance is exclusive. Correlatively, a statutory remedy for enforcement of a common-law right is deemed only cumulative.

---

[t]he state or any political or civil subdivision thereof, any person employing 8 or more persons within the state and any person acting in the interest of an employer, directly or indirectly. [1955 PA 251, § 2(b).]

The FEPA excluded from covered employees "any individual employed in the domestic service of any person." Section 2(c).

But courts have forged exceptions to these general rules when the statutory rights infringed were civil rights. Although there is some authority to the contrary most decisions have held that a person aggrieved by the violation of a civil rights statute is entitled to pursue a remedy which will effectively reimburse him for or relieve him from violation of the statute, notwithstanding the statute did not expressly give him such right or remedy. [*Id.* at 551-553 (citations omitted).]

Turning to the argument of the General Motors Corporation that there was no private cause of action, *Pompey* rejected the argument and restated the rule:

Our Court unqualifiedly rejected such an argument when dealing with civil rights statutes, concluding that the aggrieved person may maintain an action for damages for injuries suffered by the violation of the civil rights statute despite the fact that the statute made no express provision for such recovery. We cited as the controlling principle:

" 'In cases where there has been illegal discrimination the person aggrieved has clearly a civil right of action for damages, and this is true although the provision for the enforcement of a civil rights statute under which the complainant claims redress provides for a criminal prosecution only. This right accrues by virtue of the general rule that where a statute imposes upon any person a specific duty for the protection or benefit of others, neglect or refusal to perform the duty creates a liability for any injury or detriment caused by such neglect or refusal, if the injury or hurt is of the kind which the statute was intended to prevent.' " [*Id.* at 555-556 (citations omitted).]

### 1963 MICHIGAN CONSTITUTION

In 1963, the people of Michigan took another significant step when they adopted the new Michigan Constitution. The constitution provides:

> No person shall be denied the equal protection of the laws; nor shall any person be denied the enjoyment of his civil or political rights or be discriminated against in the exercise thereof because of religion, race, color or national origin. The legislature shall implement this section by appropriate legislation. [Const 1963, art 1, § 2.]

The Address to the People explained that a primary mission of this provision was to ensure equal opportunity in the pursuit of employment.[29] By doing so, this provision "elevated an employee's statutory right under the FEPA to the status of a constitutional right . . . ." *Boscaglia v Michigan Bell Telephone Co*, 420 Mich 308, 314, n 8; 362 NW2d 642 (1984). Although the provision is self-executing with respect to state action,[30] the people left it up to the Legislature to implement the constitutional provision with respect to private discrimination.[31] However, once the Legislature acts, as it has with respect to gender discrimination in private employment, the scope and the availability of remedies for unlawful discrimination are vital to effectuating the intent of the people and of the Legislature.

In 1963, the people did not leave the enforcement of the equal protection provision to chance when they

---

[29] The Address to the People was the drafters' explanation of what they believed the provisions meant. It stated:

> The convention record notes that "the principal, but not exclusive, areas of concern are equal opportunities in employment, education, housing and public accommodations." [2 Official Record, Constitutional Convention 1961, p 3363.]

[30] See *Civil Rights Dep't ex rel Forton v Waterford Twp Dep't of Parks & Recreation*, 425 Mich 173, 186; 387 NW2d 821 (1986).

[31] *Boscaglia*, 420 Mich 314, n 8, citing *Pompey*, 385 Mich 559, n 20, and Cramton, n 26 *supra*, p 30.

constitutionally created the Michigan Civil Rights
Commission.

> There is hereby established a civil rights commis-
> sion . . . . It shall be the duty of the commission in a man-
> ner which may be prescribed by law to investigate alleged
> discrimination against any person because of religion, race,
> color or national origin in the enjoyment of the civil rights
> guaranteed by law and by this constitution, and to secure
> the equal protection of such civil rights without such
> discrimination. . . .
>
> The commission shall have power, in accordance with
> the provisions of this constitution and of general laws gov-
> erning administrative agencies, to promulgate rules and reg-
> ulations for its own procedures, to hold hearings, adminis-
> ter oaths, through court authorization to require the attend-
> ance of witnesses and the submission of records, to take
> testimony, and to issue appropriate orders. The commission
> shall have other powers provided by law to carry out its
> purposes. *Nothing contained in this section shall be con-
> strued to diminish the right of any party to direct and
> immediate legal or equitable remedies in the courts of this
> state.*
>
> Appeals from final orders of the commission, including
> cease and desist orders and refusals to issue complaints,
> shall be tried de novo before the circuit court having juris-
> diction provided by law. [Const 1963, art 5, § 29 (emphasis
> added).]

The purpose of the emphasized sentence is funda-
mental in resolving the instant issue. An instructive
article written by Professor Roger Cramton has been
relied on by this Court many times. See Cramton, *The
powers of the Michigan Civil Rights Commission*, 63
Mich L R 5 (1964). Professor Cramton discussed the
creation of the Civil Rights Commission and its effect
on judicial remedies.

The third sentence of the second paragraph of article V, section 29 provides: "Nothing contained in this section shall be construed to diminish the right of any party to direct and immediate legal or equitable remedies in the courts of this state." This sentence, referred to as the "judicial remedies provision," was the subject of much confusion and debate in the convention, but its purport is reasonably clear. The convention did not intend to confer exclusive jurisdiction in the civil rights field on the Commission. *Remedies in the courts, including both those existing at the time and those subsequently created by legislative enactment or judicial decision, are not affected by the civil rights commission provision.* Thus, an individual who has been subjected to illegal discriminatory treatment in a place of public accommodation may bring a damage action in the circuit court against the business engaged in such discrimination; and the legislature may create new civil and criminal remedies for acts of private discrimination and may vest jurisdiction in the courts. [*Id.* at 22-23 (emphasis added).][32]

As Professor Cramton observed, the judicial remedies clause was the subject of much debate. While the debates accompanying the adoption of the Michigan Constitution are not controlling, they may be helpful in interpreting it. *Beech Grove Investment Co v Civil Rights Comm,* 380 Mich 405, 427; 157 NW2d 213 (1968) (opinion of ADAMS, J.). The debates accompanying the development of the judicial remedies clause reveal that the role of the judiciary in enforcing civil rights was to remain supreme.

---

[32] In a footnote, Professor Cramton observed:

The discussion of the "judicial remedies" provision may be found in 2 [Official Record, Constitutional Convention 1961, pp] 1999-2001, 2192-[21]96, 2756-[27]62. The debate clearly indicates that the primary intent was to preserve judicial jurisdiction in the civil rights field. [*Id.* at 23, n 76.]

On March 29, 1962, the delegates considered the Donnelly Amendment,[33] which would be the precursor to the sentence that was eventually adopted. In offering the proposal, Miss Donnelly stated:

> The desire to protect citizens should be most vital to us all, the most important thing, in my opinion, the constitutional convention may do—not taxation, not reapportionment, but rights of citizens and humans who are under this state and who wish to live here. Anyone who suggests that the courts of this state will abuse people and that a commission will not abuse people quite frankly horrifies me. To me the last source of strength and relief of any free people is in the courts of any country, and without such provision giving the courts of this state some right to act, I believe that they cannot act, and they cannot aid any citizen who is feeling abuse, or who is wanting immediate direct relief.
>
> *This is constitutional language that we have spelled out. We have left very little to the legislature.* For a court to act they must find their authority, in my opinion, in the constitution. Therefore, I feel that if we really wish to protect all citizens from all abuse and we really believe that this is a high point, we must build in this a check and a balance, as we have in all other constitutional documents. I therefore urge the support of this amendment. [2 Official Record, Constitutional Convention 1961, p 1999 (emphasis added).]

Miss Donnelly later added:

> I intend that any individual who wants immediate legal or equitable remedy in the courts of the state should be able to go there immediately and directly, if that's what they

---

[33] The amendment would insert the sentence:

These provisions shall not be construed to deny, or enable or allow the denial of, any direct and immediate legal or equitable remedy in the courts of this state, to any person affected thereby. [2 Official Record, Constitutional Convention 1961, p 1999.]

want. *I feel this is a civil right of every person.* [*Id.* at 2000 (emphasis added).]

The opponents of the Donnelly Amendment urged that there should be an exhaustion of administrative remedies requirement. In contrast, the supporters of the amendment stressed the importance of access to the courts in the civil rights arena. For example, Mr. Habermehl stated:

> I have always been of the opinion that people's constitutional rights have been a long time accruing to each individual; that those rights are expressed in a document we call a constitution. That we have a court or judicial system set up which has a primary purpose of enforcing and safeguarding those rights. If the intention here is to create a commission that would deprive or even unduly delay the rights of the individual to any legal remedy that he might have, I suggest you are doing far more to harm civil rights than you are doing to help it. Certainly we cannot deprive persons, whether plaintiff or defendant, of insisting upon legal rights guaranteed to them. To do so would be a backward step in civil rights, not a forward one. I support the Donnelly amendment. [*Id.* at 2001.]

The Donnelly Amendment passed by a vote of seventy-eight yeas to thirty-six nays.

On April 6, 1962, the Committee of the Whole considered the Garvin Amendment, which would have deleted the previously adopted Donnelly Amendment. In the amendment's place, it would have substituted an election of remedies requirement, which would have provided that if either party initiated action in the agency, there would be an exhaustion of administrative remedies requirement before the courts could act. *Id.* at 2192-2196. This amendment was defeated by a vote of sixty-nine nays to forty-two yeas.

On April 24, 1962, the issue came up again with another proposed amendment that would delete the judicial remedies sentence. *Id.* at 2756-2759. The supporters of the amendment argued that the Civil Rights Commission should be given the same treatment that all other administrative agencies would receive, in particular, that *all* agencies would be shielded from judicial interference by an exhaustion of administrative remedies requirement. *Id.* at 2756-2758. Miss Donnelly again defended her judicial remedies sentence:

> If my memory serves me, this is the third time that I have defended this sentence or something similar thereto. . . . The difference between this commission and all other commissions is this is the only constitutionally created one. . . . This is an instance where we are setting something up in the constitution. . . . Where we're going to put something in the constitution, you've got to be sure it's broad enough to protect all and it will not derogate downward. The legislature cannot subtract this, in my opinion.
>
> *Therefore, in order to preserve the civil rights of any citizen to go to the courts of this state for their direct and immediate remedy, there is only one place we can do it, and that's here. And I believe that all the citizens should be protected in this right more than almost any other right we've ever gotten and ever had in our whole life. I submit that the only place that any rights have ever been protected have been in the courts of this land, and when you start saying the courts of the land may not act, then I am wondering what direction you really want to go, and do you really believe in the democracy and freedom of people or do you want a complete police state? Therefore, I am highly opposed to this amendment and suggest that it is being attacked in a rather dubious method.* [*Id.* at 2758 (emphasis added).]

The final speaker before the vote on the amendment was Mr. Ford, who supported the amendment. He stated in part:

> [T]here is no question, and there shouldn't be in the mind of any lawyer in this convention that we are making it impossible for the legislature to provide a system of procedure that would require certain matters to be taken before the commission before they were taken into the court. And that's what the effect of Miss Donnelly's language is. I know that this is the effect and I believe that this is what she intends, because I worked with her trying to perfect this, and you may remember that we passed over this matter once before, trying to clean up this language.
>
> Now, when we were cooperating with her, I thought we were trying to say that nothing in this section should be in derogation of the person's rights otherwise provided by the law. But what we are really saying here, and the effect of this last sentence is, when it says "Nothing contained in this section shall be construed to diminish the right of any party to direct and immediate legal or equitable" relief, we are forestalling the legislature from saying that certain types of cases must be followed in a certain procedural pattern before you go to the court. [*Id.*]

However, Mr. Ford's concerns were disregarded by the majority when it defeated the amendment by a vote of seventy-seven nays to thirty-seven yeas. Three more amendments[34] were offered that would weaken the language of the judicial remedies sentence and all

---

[34] One proposal would have changed the language to provide as follows:

> Nothing contained in this section shall prohibit the legislature from enacting law granting any party the right to a direct and immediate legal or equitable remedy in the courts of this state. [*Id.* at 2759.]

A second proposal was to change the sentence to provide:

three were defeated. *Id.* at 2759-2762. Later that same day, the final language of the sentence was adopted by a vote of 110 yeas to nine nays.

### EXPANDING CIVIL RIGHTS

As the scope of the equal protection provision has expanded, it has always included the private right to judicial remedies, whether expressly provided by statute or inferred by the judiciary.[35] The Legislature has done nothing in the subsequent history to impair or restrict the aggrieved individual's access to judicial remedies. Nor could it under Const 1963, art 5, § 29.

In 1976, the Michigan Civil Rights Act consolidated the existing civil rights statutes into one statute and, more importantly, expanded the scope of protection against discriminatory actions. House Legislative Analysis, HB 4055 (Second Analysis), December 30, 1976. Entwined with the new expanded rights was the right to bring a civil action in circuit court. MCL 37.2801; MSA 3.548(801).[36]

---

Nothing contained in this section shall be construed to diminish the right of any party to direct and immediate legal or equitable remedies in the courts of this state, unless otherwise provided by law. [*Id.*]

The third proposal would have provided:

Nothing contained in this section shall be construed to diminish the right of any party to direct and immediate legal or equitable remedies in the courts of this state after exhaustion of all administrative remedies that may be provided by law. [*Id.* at 2761.]

[35] The private civil remedy includes the right to jury. *King v General Motors Corp*, 136 Mich App 301, 308-309; 356 NW2d 626 (1984).

[36] "A person alleging a violation of this act may bring a civil action for appropriate injunctive relief or damages, or both." Section 801(1). Additionally, we have previously found that the Civil Rights Act expanded the types of remedies beyond those provided by any of its predecessor statutes. *Eide*, n 17 *supra* at 35-36.

In *Boscaglia,* we found that the Civil Rights Act extended *Pompey.* We noted:

The FEPA, enacted in 1955, declared that the opportunity to obtain employment without discrimination because of race, color, religion, national origin, or ancestry is a civil right, and stated a definition of an "unfair employment practice." In *Pompey* [at 560] . . . this Court declared that an employee "can maintain a civil damage action for redress of his statutorily created right to be free from [racial] discrimination in private employment, and that this remedy may be pursued in addition to the remedial machinery provided by [the FEPA]."

The civil rights act, enacted in 1976, prohibits an employer from discriminating against a person on the basis of religion, race, color, national origin, age, sex, height, weight, or marital status. The act extended "this Court's decision in *Pompey* by expressly providing for direct access to circuit court for an aggrieved party." *Holmes v Haughton Elevator Co,* 404 Mich 36, 44; 272 NW2d 550 (1978) (MOODY, J., concurring). This "direct access" provision states that a person alleging a violation of the act may bring a civil action for appropriate injunctive relief "or damages, or both," and that the term "damages" means "damages for injury or loss caused by each violation of this act, including reasonable attorney's fees." [*Boscaglia,* 420 Mich 314-315 (citations omitted).]

V

I would find that the judicial remedies provision in Const 1963, art 5, § 29, along with the tone of the debates that produced that provision, reveal that an aggrieved individual's access to judicial remedies is inseparably interwoven with the substantive civil rights and was intended by the people of Michigan to be the lifeblood of keeping those substantive civil rights alive. When the civil liberty at stake is equal opportunity in the pursuit of employment, I believe

that the Michigan Constitution prevents us from granting the defendant's request to surgically sever the constitutional right to a judicial forum. In short, I would find that an aggrieved individual's access to a judicial forum to remedy violations of his nonnegotiable, constitutionally guaranteed, and legislatively articulated civil rights, is also a nonnegotiable state right. Accordingly, I would find that the people of Michigan and the Legislature intended to preclude prospective waivers of judicial remedies.

The defendant's amici curiae contend that both the FAA and the MAA apply and that the public policy favoring arbitration directs us to enforce a prospective arbitration agreement. Even if either statute does apply, I would follow *Gilmer*'s lead and hold that the public policy favoring arbitration can be outweighed by contrary constitutional or legislative intent. I have determined that in the instant case it is outweighed by the public policy expressed in the Michigan Constitution guaranteeing aggrieved individuals direct access to a judicial forum and by subsequent legislative intent.[37]

---

[37] I find persuasive the reasoning of the Colorado Supreme Court in *Lambdin v Dist Court In & For the 18th Judicial Dist*, 903 P2d 1126 (Colo, 1995). *Lambdin* held that clear legislative intent could preclude prospective waivers of a statutory right to pursue judicial remedies. *Id.* at 1131. There, the legislative intent was expressed in a statutory provision that provided: "Any agreement, written or oral, by any employee purporting to waive or to modify his rights in violation of this article shall be void." *Id.* at 1129, quoting Colorado's Wage Claim Act, 3B Colo Rev Stat 8-4-125. The court held that this provision included statutory judicial *remedies*. Colorado has adopted the Uniform Arbitration Act (UAA). By comparison, the MAA is Michigan's version of the same UAA.

*Lambdin* stated:

We hold that the UAA cannot breathe life into an arbitration agreement that the Wage Claim Act deems void. Thus, notwithstanding the general validity of arbitration agreements under the

Additionally, I note that we have previously held that an employee's substantive civil rights are not for sale. *Betty*, 446 Mich 282. Along those same lines, there is another reason for not enforcing a prospective waiver of access to a judicial forum. The defendant argues that an employee is free to seek employment elsewhere if he does not wish to waive prospectively his right to a judicial forum. However, this argument is based on the erroneous assumption that job opportunities are fungible and readily available. In contrast, I believe that rights secured by our constitution and the Michigan Civil Rights Act should not rise or fall on an employee's economic ability to walk away from employment. Further, I find that the notion that an employer can require an employee, as a condition of employment, to "sell" his constitutionally guaranteed right to direct access to a judicial forum to enforce his Michigan civil rights *against that same employer* is repugnant to the longstanding Michigan public policy that holds dear civil liberties, such as the pursuit of employment.

VI

In conclusion, with respect to equal opportunity in the pursuit of civil liberties, such as employment, I believe that the right to be free from unlawful dis-

---

UAA, the clear mandate of section 8-4-125 is that an employee may not waive the rights the General Assembly created in the Wage Claim Act by means of an arbitration agreement. [*Id.* at 1130.]

Likewise, I would hold that even if the MAA applies, it cannot override a clear state constitutional mandate that rights secured by the Michigan Civil Rights Act are nonnegotiable. *Betty*, 446 Mich 282. Those rights include an aggrieved individual's interwoven right to direct access to a judicial forum.

crimination is of highest priority and too important to jeopardize. I further believe that the constitutionally guaranteed direct access to a judicial forum is so interwoven with the enforcement of civil rights in Michigan that we cannot separate them without potentially harming substantive civil rights. Accordingly, I would hold that the Michigan Constitution and our longstanding public policy preclude the enforcement of prospective arbitration agreements in employment contracts.

Finally, I would assert that I am not backing away from the public policy favoring alternative means of dispute resolution. For aggrieved individuals seeking to pursue remedies for claims that have already accrued, arbitration may present a quicker and cheaper means of receiving relief, and I fully support the parties' voluntary intent in those cases. I would limit this opinion to the arbitration agreements in employment contracts entered into before any claim for unlawful discrimination has accrued.

VII

Finding no enforceable agreement to arbitrate this claim, we reverse the decision of the Court of Appeals and remand for further proceedings.

LEVIN and MALLETT, JJ., concurred with CAVANAGH, J.

BOYLE, J. (*concurring*). I agree with parts I, II, and VII of the lead opinion that the handbook language at issue in this case did not create a valid agreement to arbitrate civil rights claims. I express no opinion regarding whether or when an agreement to arbitrate might be found to be enforceable.

BRICKLEY, C.J., and RILEY and WEAVER, JJ., concurred with BOYLE, J.