Victoria WELDON, Plaintiff,

v.

GREAT WHITE NORTH DISTRIBUTION SERVICES, L.L.C., et al, Defendants.

No. 99–75575.

United States District Court,
E.D. Michigan,
Southern Division.

March 29, 2002.

172.

Randall J. Gillary, Kevin P. Albus, Randall J. Gillary Assoc., Troy, MI, for plaintiff.

Andrew J. Bean, Detroit, MI, for defendants.

### OPINION AND ORDER GRANTING IN PART AND DENYING IN PART, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROBERTS, District Judge.

## I. INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment. Plaintiff is a resident of Michigan and a former employee of Defendant Great White North Distribution Services, LLC ("GWN"). Defendants GWN and Deutsche Post Global Mail ("DPGM") are both residents of Virginia.[1] Plaintiff has brought this employment action against GWN, and DPGM as its successor, alleging breach of contract and violations of the Elliot–Larsen Civil Rights Act ("ELECRA"), the Federal Equal Pay Act

---

1. Great White North is a Virginia limited liability company with its principle place of business in Sterling, Virginia. Deutsche Post Global Mail's principal place of business is also Sterling, Virginia, however it is unclear where it is incorporated.

("FEPA"), and the Michigan Sales Commission Act. Plaintiff alleges that she received lower compensation and was treated less favorably than similarly situated male employees, that her termination constituted a breach of her employment agreement, and that Defendants failed to pay to her the full amount of her commissions.

## II. BACKGROUND

In 1994, Plaintiff was hired as a sales representative by Great White North Mailing Services, which she claims is the predecessor of GWN. *Complaint* ¶ 7. She was paid an annual salary as well as commissions ranging from 1 percent to 5 percent on any sales she obtained. *Id.* She was also given the title "Canadian Account Executive." *Id.* Plaintiff was successful in her position and, as a result of the explosive growth in sales, had to scale back her sales efforts to provide customer service, accounting services, and other aspects of the business. *Compl.* ¶ 10. In 1996, Great White North Mailing Services entered into an agreement with Global Mail, Ltd., which resulted in the formation of Defendant GWN. As a result, Global Mail acquired a 75 percent stake in GWN and Great White North ceased to exist. *Compl. & Ans.* ¶ 11. Plaintiff alleges that following the formation of GWN she continued to perform the same services for GWN that she had performed for Great White North Mailing Services. *Compl.* ¶ 12. Plaintiff further alleges that she was paid in the same manner as she had been prior to GWN's formation. *Id.*

In 1997, Plaintiff alleges that GWN changed the terms of her compensation to include goals for sales revenue and gross margin. This meant that her compensation would be determined, in part, by the efforts of other sales representatives. *Compl.* ¶ 13. Plaintiff alleges that these changes had the result of decreasing her compensation even though the revenues she generated for the company had increased. *Id.* Plaintiff further alleges that throughout 1997 and 1998 she and GWN attempted to negotiate a new employment agreement. *Compl.* ¶ 14. On April 6, 1998, Plaintiff and GWN executed an Employment Agreement that provided that Plaintiff was to be appointed GWN's Canadian Sales Director. *Compl. & Ans.* ¶ 15. The Agreement also provided that GWN could only terminate the Employment Agreement for "reasonable cause." *Id.* The agreement also contained several provisions on how her commissions were to be paid, but the parties do not agree on their meanings. *Id.*

Plaintiff alleges that in September 1998, Deutsche Post purchased or otherwise acquired all of the stock of Global Mail, Ltd and that thereafter Global Mail was renamed Deutsche Post Global Mail (Defendant—DPGM); Defendant, however, denies this allegation. *Compl. & Ans.* ¶ 16. Plaintiff further alleges that through the last half of 1998 and throughout 1999 and 2000, GWN committed numerous breaches of the Employment Agreement including:

- Defendants paid Plaintiff's sales commission calculated on an account by account basis rather than a job-by-job basis as required by the Employment Agreement. Defendant also calculated and paid such commissions on the actual gross margin of various sales rather than on the expected gross margin as required by the Employment Agreement.

- Defendants failed to pay Plaintiff's commissions on the Neodata account in accordance with the terms of the Employment Agreement.

- Defendants failed to allow Plaintiff to maintain her top accounts based on 95 percent of the previous year's revenue as required by the Employment Agreement.

- Defendants failed to properly pay Plaintiff split commissions on certain accounts.
- Defendants improperly paid Plaintiff split commissions on accounts for which she should have received full commissions.
- Defendants eliminated certain pricing options.

Defendants deny these allegations. *Ans.* ¶ 17.

In late 1998 or early 1999, DPGM purchased or otherwise acquired the remaining 25 percent of GWN and continued to operate GWN as a separate entity until approximately November 30, 2000, when GWN was allegedly liquidated. *Compl.* ¶ 18. Defendants admit this allegation and contend that DPGM acquired "additional interest" in GWN in an asset-only purchase. *Ans.* ¶ 18.

On or about November 30, 2000, Plaintiff was terminated when the Livonia facility was closed by Defendants. Plaintiff alleges that she was wrongfully terminated in breach of the Employment Agreement because although her facility was closed, nothing in the Agreement required her to work in the Livonia facility in order to adequately perform her sale activities.

Plaintiff also alleges that she was subjected to adverse employment decisions by the Defendants concerning her compensation and terms and/or conditions of her employment. In particular, Plaintiff alleges that she was paid substantially less than male sales representatives during her employment with Defendants for doing the same work. *Plaintiff's Response Brief,* p. 7–8. Plaintiff further alleges that during her 1999 Employment Agreement negotiations she was asked to become an independent contractor sales representative. *Pl. Resp.,* p. 8. Had she done so she alleges she would have had to give up her entire customer base and start over. *Id.* Plaintiff alleges that this same rule did not apply to

Defendants' top male sales representatives. *Id.* In April 2000, Defendants presented sales awards to all top-producing male sales representatives but did not present an award to Plaintiff, who is the only female top-producing sales representative despite the fact that her sales exceeded several of the representatives awarded. *Pl.Resp.,* p. 9. Finally, in the fall of 2000 when Defendants decided to close down their Livonia facility Plaintiff requested to work from a home office. *Id.* Despite the fact that several male sales representatives were to work out of home offices, Plaintiff alleges that she was denied that opportunity. Defendant seeks dismissal of all of the Plaintiff's claims.

## III. ANALYSIS

### A. Standard

Under F.R.Civ.P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis,* 57 F.3d 476, 478 (6th Cir.1995). A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir.1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor. *Cox v. Kentucky Dept. of Transp.,* 53 F.3d 146, 150 (6th Cir.1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Snyder v. Ag Trucking, Inc.*, 57 F.3d 484, 488 (6th Cir. 1995). To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c). *Cox*, 53 F.3d at 149. Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on which that party will bear the burden of proof at trial. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir.1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir.1989). Thus, a motion for summary judgment is a means by which to challenge the opposing party to "put up or shut up." *Cox*, 53 F.3d at 149; *Street*, 886 F.2d at 1478. The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact. F.R.Civ.P. 56(e); *Cox*, 53 F.3d at 150. The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint. *Copeland*, 57 F.3d at 479. The mere existence of a scintilla of evidence to support the non-moving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party. *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

## B. Successor Liability

■ Defendant DPGM argues that it is not a proper party to this lawsuit because it is not bound by the April 6, 1998 Employment Agreement between GWN and Plaintiff. This argument is without merit.

In July 1996, GM [2] became a shareholder of GWN with Robert C. Shenefelt and Michael R. Post.[3] *Def's Exh. A.* The Asset Purchase Agreement states that the assets include "all trade accounts receivable, prepaid expenses, furniture fixtures and equipment, deposits, trade names and goodwill." *Id.* The Purchase Agreement also states, however, that the buyers were not assuming any employment agreements. *Id.* However, Plaintiff's Employment Agreement, which is the agreements at issue here, expressly states at the first Paragraph that "GWN" included "any subsidiary, associate, parent, shareholder company or affiliate." *Pl.Resp.Exh. E.*

Defendants contend that all management staff at GWN, including Plaintiff, understood that GM and GWN were being run separately. In August 1998, Deutsche Post AG purchased all of GM's stock. *Pl. Resp.Exh. C.* In December 1998 GM purchased Shenefelt's and Rand's interests in GWN. On February 6, 2001, GM's name was changed to DPGM.

There is no real dispute that GWN operated as a separate entity after DPGM bought its remaining shares from Shenefelt and Rand. On January 1, 1999, however, GWN discontinued operations and its assets and liabilities were transferred to GM. *Pl.Res.*, p 2 (citing Geller Dep pp. 24–26). In addition, GWN's clients were told their business relationship would not change other than the billing and inquiries would come from GM's office in Virginia.

---

**2.** GM was a Delaware corporation owned by Harry Geller, Glenn Cafritz, and Irving Rosenberg.

**3.** By the terms of the Agreement GM owned 75 percent, Shenefelt 12.5 percent, Post 12.5 percent.

*Pl.Res.* P., 2. Further, Plaintiff's paychecks started to come from GM. *Pl.Exh. G.* However, Defendants argue that Plaintiff's Employment Agreement states that it can only be imposed upon DPGM if Plaintiff had provided written consent for a transfer or if GWN had assigned the Agreement to DPGM pursuant to the Asset Purchase Agreement. *Def.Br.*, p. 2; *Def.Exh G.*[4] Further, Defendants argue that Plaintiff was given the opportunity to enter into a DPGM contract, but refused. Defendants also told Plaintiff that they did not believe her contract with GWN was binding on DPGM. *Def.Br.*, p. 3.

■ The most instructive case on this issue, cited in Plaintiff's brief, is *Antiphon v. LEP Transport*, 183 Mich.App. 377, 454 N.W.2d 222 (1990). In general, "when one corporation sells its assets to another the purchaser is not responsible for the debts and liabilities of the selling corporation." *Antiphon*, 183 Mich.App. at 382, 454 N.W.2d 222. "However ... there are many exceptions:"

> The law is well settled in regard to liability of the consolidated or purchasing corporation for the debts and liabilities of the consolidating or selling corporation. Such obligations are assumed (1) when two or more corporations consolidate and form a new corporation, making no provision for the payment of the obligations of the old; (2) when by agreement, express or implied, a purchasing corporation promises to pay the debts of the selling corporation; (3) when the new corporation is a mere continuance of the old; (4) when the sale

is fraudulent, and the property of the old corporation, liable for its debts, can be followed into the hands of the purchaser.

183 Mich.App. at 382–383, 454 N.W.2d 222

In the present case, immediately upon the dissolution of GWN most (if not all) of its assets were taken over by GM. Further, Plaintiff continued to generate revenue for GM following the demise of GWN and she began to receive her paychecks from GM. Under *Antiphon*, GM's continuation of Plaintiff's employment, even without an agreement, can be construed as an implied promise to pay the debts of GWN. In other words, although GM never assumed Plaintiff's agreement they are estopped from denying successor liability because Plaintiff was reasonable in relying on GM's implied acceptance to the employment agreement.

Plaintiff also makes a strong argument that summary judgment should be denied on this issue because it is unclear whether the winding-up of GWN was done properly. Plaintiff argues that during discovery she requested documents on this issue but did not receive any. If the winding down was not done in accordance with the law, DPGM may be liable for receiving a wrongful distribution. In light of the strong rational for imposing successor liability above, the Court will deny summary judgment on this issue.

### C. Elliott–Larsen Claim

■ The modified McDonnell Douglas prima facie approach requires an em-

---

4. Plaintiff argues on page 5 of the Response, fn 5, that the Employment Agreement specifically provides that it will be binding on any successor entity. The provision states:
> Neither this Agreement, nor any of the parties' rights and obligations under this Agreement may be assigned, transferred or otherwise disposed of by either party without the other party's written consent, unless

such assignment is a transfer or disposition to a successor to the business or to the purchaser in a sale of Great White North, in which case consent of the Employee (written or otherwise) is not required ...
Plaintiff misreads the provision. It simply states that if GWN is sold the company may assign the agreement to the buyer without consent of the employee.

ployee to show that the employee was (1) a member of a protected class, (2) subject to an adverse employment action, (3) qualified for the position, and that (4) others, similarly situated and outside the protected class, were unaffected by the employer's adverse conduct. The purpose of the prima facie test is to 1) remove the most common nondiscriminatory reasons for the employer's action, such as poor employee performance, and 2) to force the employer to articulate a nondiscriminatory reason for the discharge. Once the employer produces evidence of a nondiscriminatory reason for the discharge, even if that reason later turns out to be incredible, the presumption of discrimination evaporates.

*Town v. Michigan Bell Telephone Co.,* 455 Mich. 688, *695, 568 N.W.2d 64, *68 (1997)

The crux of Plaintiff's Elliot–Larsen claim is that she was paid a lower commission than Defendants' male sales reps despite the fact that she brought in equal or greater revenue. Although Defendants focus first on the more complicated and fact intensive question of whether Plaintiff is similarly situated to DPGM's sales reps, the more fundamental question is whether Plaintiff suffered an adverse employment action.

█ In order for an employment action to be considered adverse two factors must be met: (1) the action must be materially adverse in that it is more than "mere inconvenience or an alteration of job responsibilities"; and (2) there must be some objective basis for demonstrating that the change is adverse because "a plaintiff's subjective impressions as to the desirability of one position over another [are] not controlling." *Wilcoxon v. Minn. Mining & Manufacturing,* 235 Mich.App. 347, 364, 597 N.W.2d 250 (1999).

Plaintiff has presented some objective evidence of a disparity in pay between what Plaintiff makes in commissions and what DPGM's male sales reps make. *Pl. Br.* p. 7, Exh. L. Based on her calculations, she had the second highest revenue but the male sales reps all received higher pay. *Id.* In addition, Plaintiff hired Dr. Thompson, an economist, as an expert witness. Dr. Thompson looked at the evidence and concluded that "there is a great deal of statistical evidence to support the claim that there was a gender-based difference in compensation in these positions at defendant". *Pl.Exh. M.* However, Dr. Thompson admitted that his statistical analysis could not answer whether Plaintiff was subjected to gender-based discrimination. *Aff.Dr. Thompson,* p. 31, 10–16.

It is not disputed that Plaintiff has a different compensation formula in her GWN Employment Agreement than DPGM's sales reps. Defendants argue that in 1998 Plaintiff was offered the same agreement that top male DPGM sales reps had, but she opted instead to keep her own unique agreement, which includes an assigned customer service representative. *Def.Br.* p. 7–8. In 1999, DPGM tried to negotiate a DPGM agreement with Plaintiff that would not have contained the unique provisions of her GWN Agreement. Instead, Defendants offered Plaintiff a DPGM agreement that was virtually identical to the top male DPGM sales rep. *Def.Br. 12.* Defendants have attached a proposal in which she was offered a 12 percent commission. *Def.Br.Exh. O.* Further, based on her own email message, it appears that Plaintiff acknowledged that she was being offered a 12 percent commission and was willing to exchange a 2 percent reduction in her commission rate in exchange for a permanent, dedicated customer service representative. *Def. Br.Exh. BB.* Thus, despite the fact that Plaintiff offered several proposals illustrat-

ing that she was never offered a 12 percent commission, her email message undermines her position. The email message is dated June 16, 1999, while Plaintiff's proposals are dated March 9, 1999 *(Pl.Exh O)* and April 1, 1999 *(Pl.Exh.p);* therefore it is possible that the 12 percent offer/exchange came later in the negotiation process.[5] Nevertheless, it appears undisputed that Plaintiff rejected the proposed agreement. The proposed agreement was nearly identical to the one Todd Bentley, the only other sales representative working for GWN, later signed. Despite the fact that Bentley is the employee most comparable to Plaintiff, Plaintiff has not provided any evidence that she was offered an agreement that was less favorable.

Based on the above analysis, Plaintiff has failed to show that she suffered an adverse employment action based on the fact that her commissions were substantially lower than DPGM's male sales representatives. It is undisputed that Plaintiff was offered a 12 percent commission. It is also undisputed that this percentage is comparable to what top male sales reps were given in commissions by Defendant. Further, Plaintiff voluntarily agreed to trade 2 percent of the commission to have the help of a customer service representative. Finally, it is undisputed that Plaintiff did not accept the proposed agreement, opting instead to remain under her GWN Agreement. Under these facts, it cannot be said that Plaintiff suffered an adverse employment action.

▮ Plaintiff also alleges three other actions Defendants took that adversely affected her. First, Plaintiff alleges that during the 1999 negotiations Defendants offered to allow her to become an independent contractor sales representative, instead of an employee representative, if she would surrender her entire customer base. *Pl.Resp.* p. 8. Plaintiff alleges that this same rule did not apply to top male sales representatives, as Richard Gerhardt was not required to surrender his accounts. *Pl.Br.,* p. 8. However, Plaintiff also admitted that she does not know if this decision was based on gender. *Weldon Dep.,* p. 697 15–25; 661 11–25.

Second, Plaintiff alleges that she was not given an award at an April 2000 sales conference. However, all top-producing male representatives were given awards, even some with lower revenues than Plaintiff. In their Motion for Summary Judgment Defendant argued that Plaintiff has admitted that she has no facts to prove that the decision was based on her gender. *Weldon Dep.,* p. 723 8–15. In addition, Defendant points out the Plaintiff admits that she did not reach her sales goal for the year 2000. *Def.Rep,* 4.

Finally, Plaintiff alleges that, upon the closing of the Livonia facility, her request to continue in her sales position from a home office was denied, although most of the top male sales reps were permitted to work out of their home offices. This claim fails for two reasons. First, the only evidence that Plaintiff has supplied to support this claim is a letter she wrote to Harry Geller making the request to work out of the home office; a letter from Tim Kirchmer denying the request; and a letter to Kirchmer regarding the denial. *Pl.Exh. N.* The letter contains no allegations or facts supporting Plaintiff's allegation. In fact, the letter from Tim Kirchmer states that the reason Plaintiff's request was denied is because her sales had fallen and she had failed to generate new business.

---

**5.** Plaintiff offered a third proposal, Exh. Q. This appears to be the same agreement as Defendant's Exh. O. Plaintiff's position is therefore undermined by the fact that the 10 percent commission is accompanied by the condition that Plaintiff will have a dedicated service representative.

In addition, Kirchmer stated that the company no longer needed a Canadian Director of Sales. Also, as with the claims above, Plaintiff has admitted that she does not have any facts to prove this happened because of her gender.

Since the hearing on the Defendants' Motion, Defendants have supplied the Court with the Affidavit of Patrick Gysel, a DPGM employee, who attests that by the time the Livonia facility closed, all GWN employees such as Plaintiff who had declined to negotiate a DPGM employment agreement, were terminated. The GWN sales representative most comparable to Plaintiff, Todd Bentley, had negotiated a DPGM contract several months prior to the plant closing. The fact that Mr. Bentley had negotiated a DMGM contract months earlier and was not a GWN employee at the time of the plant closing would so distinguish Mr. Bentley's circumstances from Plaintiffs such that she would be unable to compare her treatment to his. Thus, Plaintiff has no "similarly situated" non-protected class person to compare herself to.

Because Defendants have challenged these claims in their Motion for Summary Judgment based on the fact that Plaintiff has no evidence, based on Plaintiff's own deposition testimony, that any of these things happened to her because of her gender, Plaintiff was required to put forward some evidence to refute the lack of a genuine issue of material fact. Having failed to do so, summary judgment is appropriate on these issues.

Based on the above analysis, the Court grant Defendant's Motion for Summary Judgment on the Elliott–Larsen Claim.

## D. Equal Pay Act Claim

■ Because any differential in commissions in the present case was based on a factor other than sex (i.e. Plaintiff's own preference regarding her Employment Agreement), there is no violation of the Equal Pay Act. 29 U.S.C. § 206(d)(1)(iv) (exception to EPA where payment made pursuant to a differential based on any other factor than sex). Accordingly, Summary Judgment is GRANTED on this claim.

## E. Breach of Contract

### 1. Wrongful Termination

■ Plaintiff alleges that she was wrongfully terminated under the 1998 Employment Agreement when the Livonia facility was closed because Defendants did not have "reasonable cause." Plaintiff's Agreement specifically states that an employee may only be terminated for reasonable cause. *Plain.Exh. E.*

Defendants argue that on January 9, 1999, Plaintiff agreed to an amendment of her Employment Agreement when she executed an "at will" termination disclaimer and policy that was part of the Employee Handbook. *Def.SJExh R.* The Handbook also contains a provision, however, that states:

> The *Employee Handbook* describes the highlights of the company's policies, procedures, and benefits. This handbook should not be interpreted as a legal document or an employment contract. Employment with the company is at the sole discretion of the company and may be terminated with or without cause at any time and for any reason. Nothing in this handbook constitutes an expressed or implied contract or assurance of continued employment, or that just cause is required for termination.
>
> *Plain.Exh. X*

In *Heurtebise v. Reliable Business Computers,* 452 Mich. 405, 550 N.W.2d 243 (1996), the Court held that an employee handbook with a provision demonstrating that employer did not intend to be bound

by any provision therein did not create an enforceable arbitration agreement. 452 Mich. at 414, 550 N.W.2d 243. Similarly, the Employee Handbook in the present case explicitly states that, "[n]othing in this handbook constitutes an expressed or implied contract." Thus, pursuant to *Heurtebise*, Plaintiff's Employment Agreement was not amended to include an "at will" termination provision by Plaintiff's acceptance of the Handbook.

■ However, there is another basis for granting Defendants motion on this issue. Plaintiff contends that GWN ceased doing business in January, 1999, the date on certificates filed by Defendants with the State of Virginia. *Pl.Resp.Ex F.* Accordingly, Plaintiff argues that at that time, all GWN employees became DPGM employees and, therefore, when the Livonia facility closed, there were only DPGM employees. Despite arguing that she was a DPGM employee for purposes of this claim, Plaintiff still wants the benefit of the termination only for "reasonable cause" language that is found in her 1998 GWN Employment Agreement. She contends that the plant closing was not "reasonable cause" and not the real reason for her termination because she could have performed her job at home.

■ Looking at this evidence in the light most favorable to Plaintiff, the Court finds that Defendants had "reasonable cause" for terminating Plaintiff's employment. As a matter of law, "... termination of employment of an otherwise competent employee due to an economically motivated business closing is not grounds for a wrongful discharge claim." *Friske v. Jasinski Builders, Inc.* 156 Mich.App. 468, 472, 402 N.W.2d 42, 44 (1986). "To hold otherwise would impose an unworkable economic burden upon employers to stay in business to the point of bankruptcy in order to satisfy employment contracts and

related agreements terminable only for good or sufficient cause." *Id.*

When the Livonia facility closed, Defendant terminated only employees who still had GWN employment agreements. They had reasonable cause for doing so. Accordingly, summary judgment is granted on this claim.

### 2. Payment of Split Commissions

■ Plaintiff alleges that Defendants breached the Employment Agreement by splitting her sales commissions on four accounts: Centrobe Iowa, Centrobe Colorado, Cahners and Joyce Meyers. The provision at issue states:

> split commissions (earned or given) for joint customer account development and maintenance a 50% / 50% split of commissions will take place between s/r and s/r or s/r and house for those situations when more than normal corporate client contact/assistance at industry events and twice a year at visitations are required to maintain or grow the business.
> *Plain.Exh. E., Schedule C1*

Defendants argue that this claim should be dismissed because the situations that arose allowed for splitting. In the case of the two Centrobes and Cahners, the accounts contacted Defendants and requested more contact than Plaintiff was providing. *Pl. SJ,* p. 17. In addition, Defendants argue that Centrobes and Cahners requested that a sales rep other than Plaintiff be assigned. Defendants further allege that the same is true for the Joyce Meyers account—the client was extremely unhappy and had threatened to pull the account. Further, Plaintiff had failed to keep in contact with the customer for an extended period of time. In short, circumstances called for Defendants' executives to have "more than normal contact" and "twice a year visits". Therefore, Defendants argue that they did not breach the Agreement.

Plaintiff, however, cites the deposition testimony of Robert Shenefelt, who negotiated the provision on behalf of the Defendants. Based on this testimony, Plaintiff argues that it was not intended that the splitting provision would be applied mechanically whenever management visited the account more than twice in one year. In addition, Plaintiff was initially told by Harry Geller and Glenn Cafritz that the commissions were split because Shenefelt said that they should be. Shenefelt testified, however, that when they contacted him he told them the accounts at issue should not be split.

The contradictory accounts of what Shenefelt told Defendants raises an issue of fact on whether commissions were to be split and the company policy for splitting shares under this rather ambiguous provision. Accordingly, summary judgment is **DENIED** on this claim.

### 3. Payment on Actual Gross Margins

 Defendants argue it was not a breach to calculate commissions based on actual gross margins. Defendants argue that the Agreement clearly provides that commissions were to be based upon the gross margins "achieved":

5.0% of gross sales that *achieves* a minimum of 35% or more of gross margin over cost of good sold.

.5% of gross sales, as approved by sales management for jobs that achieve less than 20% gross margin over cost of good sold.

*Def.SJExh. G, Sched. C1.* Defendants also note that Plaintiff, in an email, acknowledged that calculating commission on actual gross margin dollars achieved was "fair" and that they weren't calculated in the past because GWN wasn't able to do so. *Def.SJExh. W.*

Plaintiff, however, cites a provision in the same document which states:

Compensation is based on your customers projected gross margin, as your gross margin increases, your commission rate increases and your income increases. . . .

There appears to be a question of fact over what contract provision to apply, and what the past practices between the parties has been. Accordingly, summary judgment is **DENIED** on this issue.

### 4. Eliminating Pricing Options

 Defendants argue that it was not a breach of the Agreement to preclude Plaintiff from selling businesses that had less than 20 percent gross margin, as Plaintiff had argued in her Complaint. Defendants argue that the Agreement clearly provides that the sale of business that would generate less than 20 percent gross margin could only be done with management approval. *Def.SJ, Exh G.*

 Plaintiff did not address this issue in her Response. The opponent of a summary judgment motion has the burden to show that a "rational trier of the fact" [could] find for the non-moving party or that there is a "genuine issue for trial." *Historic Preservation Guild v. Burnley,* 896 F.2d 985, 993 (6th Cir.1989), quoting *Matsushita Electric Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Having failed to offer even a "scintilla of evidence" on this claim, the Court **GRANTS** summary judgment.

### 5. Paying Commissions by Account

 Defendants argue that it was not a breach to pay Plaintiff on an account-by-account basis. Defendants point out that Plaintiff's compensation plan attached to her employment agreement with GWN identifies her commissions as being paid per customer/job, not job-by-job. *Def. SJExh G.* In addition, Defendants note

that the drafts of Plaintiff's Agreement indicate that she is to be paid on a customer-by-customer basis. *Def.SJExh. X.* In response, Plaintiff cites the same provision of her employment agreement's compensation plan cited by Defendants, which states: "[t]he rates paid per customer/job are as follows...." *Pl.Res.Exh. X, Sched. C–1.* In addition, Plaintiff has attached two documents to her Response that add to the ambiguity. First is a commission report from GWN which indicates that commissions, at times, were calculated at·different rates on a job-by-job basis within individual customer accounts. *Pl.Res.Exh. 1.* Second is a commission schedule for the International Mail and Canadian Mail account that states, "... the commission rate to be paid will be conducted on a case by case basis as they occur." *Pl.Res.Exh 2.*

Based on the evidence provided by Plaintiff, the Court finds that summary judgment on this issue is inappropriate. Although the Agreement states that Plaintiff is to be paid on a customer-by-customer basis, which could mean that an account-by-account bases was intended, it appears from GWN commission reports that her commissions were actually calculated on a job-by-job basis. The fact that different commission rates sometimes attached to individual jobs within an account adds support to Plaintiff's position. Defendants' motion for summary judgment on this issue is, therefore, denied.

### 6. Taking Away Plaintiff's Accounts

▮▮▮ Defendants argue that they did not breach the Agreement by appropriating many of Plaintiff's accounts. Under the Agreement, Plaintiff's "Base Revenue" is determined in the following manner:

—top accounts from previous year, represents appx. 95% of previous year's revenue base accounts reset each year, balance go to house

*Pl.Ex. E*, Sch. C–1.

Defendants argue that under this provision, Plaintiff agreed to give the house 5% of her accounts each year while she retained the top 95%. Plaintiff does not dispute this general interpretation, however she argues that when the Agreement was negotiated, her understanding was that adjustments would be made for lost accounts, accounts she turned over as house accounts, and certain new accounts. The net effect of these adjustments, Plaintiff alleges, is that her lowering yielding and lower potential accounts would be turned over to customer service, freeing her to pursue new business and to spend more time on her large accounts. Under Defendants' interpretation, Plaintiff argues, she is only allowed to retain those accounts which make up the top 95% of revenues, then must turn over all of her remaining accounts as house accounts.

▮▮▮ Plaintiff is essentially asking the Court to consider evidence outside the terms of the written agreement, or parol evidence. "Parol evidence of contract negotiations, or of prior or contemporaneous agreements that contradict or vary the written contract, is not admissible to vary the terms of a contract which is clear and unambiguous." *Schmude Oil Co. v. Omar Operating Co.,* 184 Mich.App. 574, 580, 458 N.W.2d 659 (1990). However, the rule is not absolute: "parol evidence of prior or contemporaneous agreements or negotiations is admissible on the threshold question whether a written contract is an integrated instrument that is a complete expression of the parties' agreement". *In re Skotzke Estate,* 216 Mich.App. 247, 251–252, 548 N.W.2d 695 (1996). In addition, there are four main exceptions which allow extrinsic evidence to show (1) that the writing was a sham, not intended to create legal relations, (2) that the contract has no efficacy or effect because of fraud, illegali-

ty, or mistake, (3) that the parties did not integrate their agreement or assent to it as the final embodiment of their understanding, or (4) that the agreement was only partially integrated because essential elements were not reduced to writing. *NAG Enterprises, Inc., v. All State Industries, Inc.*, 407 Mich. 407, 410–411, 285 N.W.2d 770 (1979). Plaintiff is essentially arguing this fourth exception: that essential elements concerning how the top 95% of her accounts were to be calculated were left out of the agreement. To this end, the parol evidence rule would not bar this evidence as a matter of law. Further, the Court finds that the provision at issue in the agreement is ambiguous. For these reasons, Defendants' Motion for Summary Judgment on this issue is denied.

### 7. The Centrobe Account

▮ Defendants argue that they did not breach the Agreement by failing to pay Plaintiff, in 1999, a guaranteed 2.5% commission on the Centrobe Colorado account, formally the Neodata account. At issue is the provision of the Agreement that states:

Commission

—the Neodata rate level will be re-classified to the actual gross margin rate level in 1999.

Defendants admit that they never paid Plaintiff a 2.5% commission on this account, but argue that the Agreement does not require them to do so. The Court agrees with Defendants on this issue. However, Plaintiff has raised an issue of fact over whether Defendants ever properly calculated the actual gross margin for each job. As Plaintiff points out, Defendants began estimating the labor rate for each job instead of using the actual labor rate for each job, which would in turn affect the calculations for actual gross margin. Thus, it is unclear whether Defendants properly calculated Plaintiff's commission on the Neodata account. In addition, Defendants offer no evidence of what the actual gross margin rate was for that account, or how that figure was calculated, that would allow the Court to make a determination of whether the Agreement was breached. Summary Judgement on this issue is therefore denied.

### F. Violation of Michigan Sales Commission Act

▮ Because the Court has denied Defendant's Motion for Summary Judgment on several of Plaintiff's claims for failure to pay commissions due, summary judgment on this issue would be inappropriate. The Michigan Sales Representative Act, M.C.L. § 600.2961, provides for the recovery of actual damages caused by a principal's failure to pay commissions; penalty damages when such failure is intentional; and, costs and attorney fees to the prevailing party. Plaintiff would, therefore, be entitled to recover under this provision if she is able to show that Defendants owe her unpaid commissions. Thus, summary judgment on this issue must be denied.

### IV. CONCLUSION

Based on the foregoing, the Court:

1. **DENIES** summary judgment on Successor Liability;
2. **GRANTS** summary judgment on Elliott–Larsen;
3. **GRANTS** summary judgment on Equal Pay Act;
4. **GRANTS** summary judgment on wrongful termination;
5. **DENIES** summary judgment on payment of split commissions;
6. **DENIES** summary judgment on payment of actual gross margins;
7. **GRANTS** summary judgment on eliminating pricing options;
8. **DENIES** summary judgment on paying commissions by account
9. **DENIES** summary judgment on taking away Plaintiff's accounts

10. **DENIES** summary judgment on failing to pay Plaintiff 2.5% on the Centrobe Account; and

11. **DENIES** summary judgment on violation of Michigan Sales Commission Act.

**IT IS SO ORDERED.**