**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0342n.06
Filed: June 18, 2008

**No. 05-2579**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| LISA PANEPUCCI, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | On Appeal from the United |
| | ) | States District Court for the |
| HONIGMAN MILLER SCHWARTZ & COHN | ) | Eastern District of Michigan |
| LLP, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

Before:       BOGGS, Chief Judge; and MARTIN and SILER, Circuit Judges.

**BOGGS, Chief Judge.**   Lisa Panepucci sued Honigman Miller Schwartz and Cohn LLP

("Honigman" or "the Firm"), the law firm at which she was an equity partner, for sex discrimination,

pregnancy discrimination, disability discrimination, and retaliation, in violation of Title VII, the

Pregnancy Discrimination Act, the Americans with Disabilities Act, and Michigan's Disabled

Persons Civil Rights Act and Elliott-Larsen Civil Rights Act.  The district court granted Honigman's

motion to dismiss on the grounds that Panepucci had to arbitrate her claims under the terms of the

arbitration clause included in Honigman's Partnership Agreement.  The clause states that partners

must arbitrate any claims "arising under or related to" the Partnership Agreement. Panepucci appeals

the district court's decision to dismiss her claim and argues that her discrimination claims do not

arise under or relate to the Partnership Agreement. We hold that the arbitration clause does cover Panepucci's claims and affirm the district court's dismissal of the case.

## I

## A. Factual Background

Panepucci graduated from the University of Michigan Law School in 1988 and joined Honigman that year as an associate in its corporate department. She became a nonpercentage partner on January 1, 1993, and a percentage partner on January 1, 1997. As of January 1, 2003, Panepucci's share of partnership units in the Firm represented less than 1% of the Firm's total partnership units. Honigman is a Michigan-based law firm, with 220 attorneys and offices in Detroit, Lansing, Bloomfield Hills, and Ann Arbor. Alan S. Schwartz is currently the CEO of Honigman.

In her complaint, Panepucci broadly alleged that Honigman treated her and other female partners differently because of their sex. In particular, Panepucci alleged that she and other female partners were denied client business development opportunities, were not given clients on the same basis as male attorneys, and were not given the opportunity to "inherit" clients on the same basis as male attorneys.

Panepucci also made specific allegations of discrimination. According to Panepucci, she took time off from work in 1999, 2000, and 2001 to pursue various infertility treatments. As a result of her time off, her billable hours dropped from in excess of 2500 hours in 1999 to approximately 1900 billable hours in 2000. She was told to expect a significant cut in her compensation as a result of the decrease. Ultimately, Panepucci's compensation for 2000 was $15,000 lower than her 1999

compensation. Panepucci does not state her overall compensation in either 1999 or 2000; therefore, a percentage change cannot be calculated. However, it seems unlikely that the cut was as great as the 24% decline in her billable hours. According to Panepucci, Samuel Stahl, another partner for whom she worked, advised her not to object to her reduced compensation, lest she be branded a "complainer and troublemaker." In January 2002, Panepucci advised more senior partners that she was planning to adopt an infant, who would be born in February 2002, and would be taking maternity leave. Panepucci told Schwartz that she intended to take twelve weeks of leave, the full maternity leave provided under firm policy. According to Panepucci, Schwartz stated that he did not agree with her taking so much time.

In February 2002, the Firm's attorney compensation committee informed Panepucci that her recommended compensation for 2001 would be identical to her 2000 compensation, despite the fact that Panepucci alleges she worked 2300 billable hours in 2001 (compared to 1900 hours in 2000). Panepucci made various objections to senior partners, and she drafted a memo on the subject while she was on maternity leave. Schwartz (then the Firm's vice chair and head of the attorney compensation committee), Joel Adelman (then the Firm's CEO), and Donald Kunz (then the Firm's corporate department head) held a meeting with Panepucci in June 2002 to discuss her 2001 compensation and her memo. According to Panepucci, Schwartz admitted that her compensation may have been off by $15,000, but did not offer to pay her that amount.

At this time, her relationship with Schwartz began to "deteriorate." In July 2003, after a dispute about how much time Panepucci should have billed to a matter she worked on for Schwartz, Schwartz advised her in a lengthy memo, which was provided to other partners, that he would not

work with her in the future. From then on, according to Panepucci, she was unable to obtain any work assignments at the Firm. Panepucci took a medical leave of absence in November 2003. Since that time, she alleges that the Firm has refused to give her data provided to other percentage partners, has discontinued payments to her, and has stopped paying her any share of the Firm's profits.

Panepucci's relationship with Honigman was governed by a Partnership Agreement and an Attorney Manual. Article X of the Partnership Agreement addresses "Dispute Resolution" and contains an arbitration clause, which states:

10.01 Arbitration

*In the event of a controversy or claim arising under or related to this Agreement or its interpretation, or, in the event of an alleged breach of this Agreement which the Partnership or any Partner disputes, the parties shall submit such controversy, claim or dispute to a binding arbitration conducted by the American Arbitration Association* ("the Association") under its Optional Procedures for Large Complex Commercial Disputes. . . . The arbitration shall be heard and decided by three (3) arbitrators, each of whom shall be a neutral chosen from the Commercial Panel of the Southfield Regional Office of the Association in accordance with the Association's procedures for selecting neutral arbitrators. The arbitration shall be conducted in Oakland County, Michigan[,] at a site mutually agreeable to the parties. . . . All discovery conducted in the arbitration shall be conducted pursuant to the Federal Rules of Civil Procedure, but depositions shall be limited to not more than five (5) (exclusive of expert witnesses) by each party to the arbitration, there shall be no requests for admissions, and all matters relating to the arbitration shall be deemed strictly confidential and shall be the subject of a protective order from the arbitrators. Specifically, the books and records of the Partnership, including, but not limited to, all matters and materials relating to the financial affairs of the Partnership and the Partners, shall be deemed strictly confidential and shall not be produceable in the arbitration, including discovery, except to the extent they are directly and materially relevant to the matter at issue as determined by the arbitrators. In addition, the admissibility of evidence at the hearing shall be governed by the Federal Rules of Evidence.

(emphasis added). In addition, the Partnership Agreement specifies in Article 10.02 that,

"[r]egardless of the outcome of the arbitration, each party shall bear its own attorney's fees, costs and all other expenses it incurs in the arbitration." Panepucci signed the Partnership Agreement on May 17, 2000. She also signed an amendment to the agreement on September 15, 2003. The Attorney Manual sets out various policies governing performance evaluations, work assignments, and all other aspects of work at Honigman.

### B.  Procedural Background

Panepucci filed a claim with the EEOC on March 9, 2004, and received her "right to sue" letter on November 24, 2004. She filed her complaint in federal district court on January 1, 2005. In her complaint, she alleged violation of Title VII's prohibition on disparate treatment because of sex (Count I), violation of Title VII and the Pregnancy Discrimination Act (PDA) based on alleged discrimination because of her pregnancy and maternity leave requests (Count II), violation of Title VII and the PDA because the Firm retaliated against her (Count III), violation of the Americans with Disabilities Act and the Michigan Disabled Persons Civil Rights Act (Count IV), and violation of the Michigan Elliott-Larsen Civil Rights Act's prohibitions on sex discrimination (Count V) and retaliation (Count VI). Panepucci sought economic and non-economic damages for her physical and emotional injury and lost wages.

Honigman filed a motion to dismiss under Rule 12(b)(1) on January 27, 2005. The Firm argued that Panepucci lacked standing under federal anti-discrimination laws because she was not an employee and that Panepucci must arbitrate her claims in accord with the Partnership Agreement's arbitration clause. Panepucci responded that she was an employee and that the

arbitration clause did not apply to her claims.

On August 9, 2005, the district court held that it lacked sufficient evidence to determine whether Panepucci was an employee and denied that part of Honigman's motion to dismiss without prejudice. The district court also held that Panepucci's allegations, "asserting claims of inequitable compensation meted out on a discriminatory basis, 'relate to' the Partnership Agreement, which sets forth the method of compensation for percentage partners." Accordingly, the court held that Panepucci's claims could not be resolved without interpretation of the Partnership Agreement and dismissed the case.

## II

We review de novo a district court's decision regarding the arbitrability of a particular dispute. *Floss v. Ryan's Family Steak Houses, Inc.*, 211 F.3d 306, 311 (6th Cir. 2000). The Supreme Court has "interpreted the Federal Arbitration Act as establishing that, 'as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.'" *Wilson Elec. Contractors, Inc. v. Minnotte Contracting Corp.*, 878 F.2d 167, 169 (6th Cir. 1989) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)). Even more forcefully, we have stated that arbitration is required "'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Masco Corp. v. Zurich Am. Ins. Co.*, 382 F.3d 624, 627 (6th Cir. 2004) (quoting *Highlands Wellmont Health Network, Inc. v. John Deere Health Plan, Inc.*, 350 F.3d 568, 576-77 (6th Cir. 2003)); *see also United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S.

574, 584-85 (1960) ("In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail . . . .").

That said, as this court has frequently noted, "the federal policy in favor of arbitration is not an absolute one. Arbitration under the Federal Arbitration Act is 'a matter of consent, not coercion.'" *Albert M. Higley, Co. v. N/S Corp.*, 445 F.3d 861, 863 (6th Cir. 2006) (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)). Accordingly, "one cannot be required to submit to arbitration a dispute which it has not agreed to submit to arbitration." *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 813 (6th Cir. 2008) (quoting *Simon v. Pfizer Inc.*, 398 F.3d 765, 775 (6th Cir. 2005)). Thus, we must not "override the clear intent of the parties, or reach a result inconsistent with the plain text of the contract, simply because the policy favoring arbitration is implicated." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002).

The arbitration clause in this case governs a "controversy or claim arising under or related to [the Partnership] Agreement or its interpretation." Such language indicates a broad intention to arbitrate. *See, e.g.*, *Highlands Wellmont*, 350 F.3d at 577 (collecting cases holding that "arising under" language constitutes a broad arbitration clause); *Cincinnati Gas & Elec. Co. v. Benjamin F. Shaw Co.*, 706 F.2d 155, 160 (6th Cir. 1983) (describing "arising out of" language as creating an "extremely broad" arbitration clause). "Where the arbitration clause is broad, only an express provision excluding a specific dispute, or 'the most forceful evidence of a purpose to exclude the claim from arbitration,' will remove the dispute from consideration by the arbitrators." *Highlands Wellmont*, 350 F.3d at 576-77 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S.

643, 650 (1986)).

Relying on the breadth of the arbitration clause, the district court held that "although [Panepucci's] claims do not allege a dispute in the [Partnership Agreement's] interpretation or a breach thereof, the allegations, asserting claims of inequitable compensation meted out on a discriminatory basis, 'relate to' the Partnership Agreement, which sets forth the method of compensation for percentage partners." The district court concluded that, absent language evincing an intent to exclude employment discrimination claims, Panepucci had failed to show that her dispute was outside the arbitration clause.

The district court's conclusion appears unassailable. "A proper method of analysis here is to ask if an action could be maintained without reference to the contract or relationship at issue." *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 395 (6th Cir. 2003). Panepucci's complaint alleges that she was entitled to more compensation than was distributed. That claim clearly requires reference to, and interpretation of, the Partnership Agreement. For example, Exhibit B, as amended, explains how a partner's "draw" is to be calculated, Article II describes how percentage partners' ownership units and capital accounts are determined, and Article III explains the allocation of net income or loss and distributions. Moreover, the Firm questions whether Panepucci qualifies as an employee under Title VII. Whatever the arbitrators decide on that question, the answer will surely require interpretation of the Partnership Agreement. *See, e.g.*, Article V (explaining role of percentage partners in governance of the Firm). Thus, it appears that Panepucci's complaint falls within the arbitration clause.

In her briefs to this court, Panepucci tries her best to evade the breadth of the arbitration

clause.[1] Her strongest argument is that reference to the Partnership Agreement will not be required because she concedes that the agreement was not breached. Panepucci further notes that her complaint does not allege that any terms of the Partnership Agreement were violated, that the alleged discrimination violated the Partnership Agreement, or that her compensation was determined in violation of the terms of the Partnership Agreement. Citing this court's opinion in *Alticor, Inc. v. National Union Fire Insurance Co.*, 411 F.3d 669 (6th Cir. 2005), Panepucci argues that the arbitration clause in the Partnership Agreement would apply to claims related to Honigman's governance and ownership, such as a claim for an accounting of profits or a demand of access to the partnership's books, but does not apply to claims of employment discrimination that don't allege any breach of the Partnership Agreement.

These concessions are ultimately unavailing. Panepucci is correct that this court has rejected the proposition that a controversy is arbitrable if it merely "touches matters covered by the arbitration clause." *See Alticor*, 411 F.3d at 673 (internal quotation marks omitted). However, her complaint still does not pass the *Fazio* test. Despite her concessions, Panepucci's action simply cannot be maintained without reference to the Partnership Agreement. Even if the agreement deals only with

---

[1] Wisely, Panepucci does not dispute that employment discrimination claims may be subject to mandatory arbitration. The Supreme Court has made clear that statutory rights, including the right to sue for employment discrimination, may be subject to mandatory arbitration. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991) (holding that age discrimination claim was subject to mandatory arbitration); *see also Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 123 (2001) (stating that "[t]he Court has been quite specific in holding that arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law"); *Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305, 309 (6th Cir. 1991) (upholding mandatory arbitration of Title VII claims).

the bare mechanics of compensation, the question of whether the other partners followed those mechanics could be a key factor in deciding whether or not they illegally discriminated against her. The key issue in Panepucci's suit is whether she was paid less and denied work because of illegal discrimination. To determine whether she was paid less will require determining a baseline of how much she should be paid, and that will require reference to the Partnership Agreement. Finally, as noted above, the terms of the Partnership Agreement will be key to determining whether Panepucci qualifies as an employee under the anti-discrimination laws.

Panepucci's other arguments are even less persuasive. According to Panepucci, the "gravamen of [her] Complaint is that she was discriminated and retaliated against in the terms and conditions of her employment on the basis of her sex, pregnancy, and disability." Appellant's Br. at 20. She notes that "[t]he Partnership Agreement covers neither employment discrimination claims nor the subject matter of [her] Complaint," matters which are left to the more detailed Attorney Manual. *Id*. at 20-21. First, we note that the Attorney Manual is not a contract. *See generally Heurtebise v. Reliable Bus. Computers, Inc.*, 550 N.W.2d 243, 247 (Mich. 1996) (holding that an arbitration clause in a handbook was not enforceable since handbook did not constitute a contract). Second, even if the manual were a contract, it would still be governed by the arbitration clause. We have held that an arbitration clause in a master or "umbrella" agreement that creates an ongoing relationship encompasses a dispute over the terms of a later contract that was entered into as part of the relationship, even if the later contract itself lacks an arbitration clause. *See Nestle Waters North Am., Inc. v. Bollman*, 505 F.3d 498, 505 (6th Cir. 2007).

Finally, Panepucci makes much of the fact that the arbitration clause states that the arbitrators

will be drawn from the AAA's commercial panel. She argues that the fact that the arbitrators will be experts in commercial law, rather than employment law, suffices to show that the parties did not intend to arbitrate employment discrimination claims. This argument is without merit. It is not true that only arbitrators with specific expertise in employment discrimination may decide employment discrimination claims. After all, "[w]e decline to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators." *Gilmer*, 500 U.S. at 30. Indeed, even manifest defects in arbitrators' subject matter expertise are irrelevant to our review of an arbitration decision. *See Michigan Family Res., Inc. v. Service Employees Int'l Union*, 475 F.3d 746, 753 (6th Cir. 2007) (en banc) (stating that, so long as the arbitrator was construing or applying the contract in question, "it made no difference whether the arbitrator had committed serious, improvident or even silly errors in resolving the merits of the dispute") (internal quotation marks omitted).

In conclusion, Panepucci's claims simply cannot be maintained without reference to the Partnership Agreement. Accordingly, the dispute falls within the agreement's very broad arbitration clause. Panepucci is now free to frame her arguments for the arbitrators, and she may frame such alternative arguments as she thinks will persuade the arbitrators to grant her relief. Since we have decided that her claims are arbitrable, we need not address her arguments that the arbitration clause's limitation on attorney's fees is invalid.[2] Such matters are left to the arbitrators and then possibly to

---

[2] We note that counsel for Honigman conceded at oral argument that the arbitrators could award attorney's fees to Panepucci if they find that she is an employee under Title VII and that the partnership's conduct violated Title VII.

a reviewing court.

## III

Therefore, for the reasons set out above, we AFFIRM the district court's decision to dismiss Panepucci's suit.