*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

FARZANA TARIQ, M.D.,

        Plaintiff-Appellant,

v

TENET HEALTHCARE CORPORATION,
SANDEEP MITTAL, STEVEN D. HAM, and
DETROIT MEDICAL CENTER,

        Defendant-Appellees.

UNPUBLISHED
March 24, 2022

No. 356904
Wayne Circuit Court
LC No. 20-007893-CD

Before: BOONSTRA, P.J., and RONAYNE KRAUSE and CAMERON, JJ.

PER CURIAM.

        Plaintiff, Farzana Tariq, M.D., appeals as of right the trial court's orders granting summary disposition in favor of defendants, Tenet Healthcare Corporation, Steven D. Ham, D.O., Sandeep Mittal, M.D., and the Detroit Medical Center.[1] Generally, plaintiff alleges that defendants engaged in retaliatory misconduct and a pattern of racial and nationality discrimination, both during and after her participation in the DMC's Neurosurgery Resident Training Program. In lieu of filing an answer, defendants moved for summary disposition, asserting that plaintiff's claims were subject to a binding arbitration agreement. The trial court agreed. We affirm.

---

[1] Unless necessary to otherwise specify, we will refer to defendants collectively as "defendants," and because Tenet is the parent corporation of the Detroit Medical Center, we will refer to the corporate entities collectively as "the DMC."

## I. FACTUAL BACKGROUND[2]

Plaintiff graduated from a medical school in Pakistan[3] in 2007. She engaged in further studies, and in 2013, she was accepted into the DMC's Neurosurgery Resident Training Program (the Program). The Program was a seven-year program, but trainee physicians received one-year appointments, with no provision for or guarantee of automatic renewal, pursuant to "Graduate Medical Education Agreement[s] of Appointment" (GME agreements). The GME agreements stated, in part, that trainee physicians were "encouraged to seek resolution of grievances . . . according to the GME Resident Policy Manual," but they did not contain an arbitration provision. They did contain provisions stating that:

> [b]oth Trainee and DMC irrevocably and unconditionally (a) consent to submit to the exclusive jurisdiction of the courts of the State of Michigan for any proceeding arising in connection with this Agreement and (b) waive any objection to the laying of venue of any such proceeding in the courts of the State of Michigan.

Nevertheless, the GME agreements also stated that their terms were "subordinate to the policies and procedures of the DMC as those policies and procedures may change from time-to-time." Plaintiff signed seven of these agreements: (a) July 1, 2013 through June 30, 2014; (b) July 1, 2014 through June 30, 2015; (c) July 1, 2015 through June 30, 2016; (d) July 1, 2016 through June 30, 2017; (e) July 1, 2017 through June 30, 2018; (f) July 1, 2018 through June 30, 2019; and (g) July 1, 2019 June 30, 2020. Drs. Ham and Mittal were two of the doctors in charge of the Program.

In late 2013 or early 2014, Tenet acquired the Detroit Medical Center, following which Tenet imposed upon the DMC a dispute resolution program it called "the Open Door Policy and Tenet Fair Treatment Process" (the FTP). In relevant part, the FTP required binding arbitration of employment disputes as the final stage of its grievance process. Employees were subjected to an online training slideshow program that monitored their progress through the training. Through the course of the module, employees were required to read two documents explaining this process. Among other things, the documents explained that claims arising out of the employee's employment were subject to binding arbitration. The training module also included a review of the DMC's Employee Handbook, no copy of which has been included in the lower court record. The relevant documents repeatedly set forth that the handbook was not a contract of employment, and the FTP was also not a contract of employment and did not "in any way alter the at-will nature of the employment relationship between [the DMC] and its employees."

---

[2] Many of the facts recited in this opinion are taken from allegations in plaintiff's complaint and are treated as true for purposes of summary disposition, but they should not be treated as undisputed or conclusively established.

[3] Plaintiff alleges, in large part, that she was treated with hostility on the basis of her sex and her Pakistani heritage. Dr. Ham is Caucasian; and Dr. Mittal and other staff members at the DMC are of Indian descent.

After an employee viewed the slides and the Open Door Policy and Fair Treatment Process documents, the training module "popped up" a further message, which, in relevant part, stated:

> Furthermore, I understand, acknowledge and agree that the Employee Handbook is not a contract of employment, that my employment with the Company is not for a specified term and that employment with the Company is at the mutual consent of the employee and the Company. Therefore, I hereby acknowledge that either I or the Company can terminate my employment relationship at will, with or without cause or notice, except to the extent that any applicable collective bargaining agreement provides otherwise.

> Open Door Policy and FTP

> In addition, I acknowledge that I have received a hard copy of the Tenet Fair Treatment Process. *Except to the extent that any applicable collective bargaining agreement provides otherwise*, I hereby voluntarily agree to use the Company's Fair Treatment Process and to submit to final and binding arbitration any and all claims and disputes that are related in any way to my employment or the termination of my employment with Tenet, with the exception of certain specific Excluded or Restricted issues outline in the Fair Treatment Process, including the filing of a charge with the National Labor Relations Board. I understand that final and binding arbitration will be the sole and exclusive remedy for any such claim or dispute that I may have against Tenet or its parent, subsidiary or affiliated companies or entities, and each of its and/or their employees, officers, directors or agents, and that I may not join any such claim or dispute with the dispute of another employee in a class, collective or group action. Arbitration under the Fair Treatment Process is limited to individual disputes, claims or controversies that a court of law would be authorized to have jurisdiction over to grant relief, and by agreeing to the use of arbitration to resolve my dispute, both the Company and I agree to forego any right we each may have had to a jury trial on issues covered by the Fair Treatment Process. I also agree that such arbitration will be conducted before an experienced arbitrator chosen by me and the Company, and will conducted under the Federal Arbitration Act and the procedural rules of the American Arbitration Association ("AAA") unless the Company and I agree otherwise.

> I further acknowledge that in exchange for agreement to arbitrate, the Company also agrees to submit all claims and disputes it may have with me to final and binding arbitration, and that the Company further agrees that if I submit a request for binding arbitration, my maximum out-of-pocket expenses for the arbitrator and the administrative cost of the AAA will be an amount equal to one day's pay if I am an exempt employee or eight times my hourly rate of pay (if am [sic] a non-exempt employee) or a mandated cap, if lower, and that the Company will pay all of the remaining fees and administrative costs of the arbitrator and the AAA. I further acknowledge that this mutual agreement to arbitrate may not be modified or rescinded except in writing by both me and the Company. [(emphasis in original).]

After viewing the above language, employees were prompted to click one of two check boxes: one for "I agree" and another for "I do not agree." Plaintiff clicked "I agree."

In 2017, plaintiff was placed on probation following her admitted, albeit isolated, commission of a professional misjudgment. Plaintiff satisfied the terms and conditions of that probation. She alleges that, following her reinstatement into good standing, the defendant doctors, as well as numerous other supervisors of non-Pakistani descent, began to find baseless fault with her work while overlooking serious violations committed by non-Pakistani doctors. Following the revelation that she and a non-Pakistani colleague co-authored a letter to the Accreditation Council of Graduate Medical Education (ACGME) expressing concerns about patient safety, defendants retaliated against her, but not against her non-Pakistani co-author. Plaintiff was terminated from the Program effective at the end of 2018. However, following plaintiff's notice of intent to sue, the DMC rehired plaintiff pursuant to a settlement and release agreement.

The settlement agreement included a comprehensive release of any claims—subject to a handful of exceptions—plaintiff might have had against defendants related to her employment or termination thereof prior to the execution of the agreement. The settlement agreement specifically excluded, in relevant part, "[a] claim for breach of this Agreement" and any claim arising after plaintiff's reinstatement to the Program. The settlement agreement did not, itself, contain an arbitration provision. However, the settlement agreement provided that plaintiff:

> acknowledges and agrees that upon reinstatement, she remains subject to all applicable policies, practices and procedures of Tenet, DMC, and the DMC Graduate Medical Education Accredited Neurosurgery Residency Program, as they may be amended from time to time.

Plaintiff executed her 2019-2020 GME agreement on June 22, 2019, and the settlement agreement was executed on July 16, 2019. However, the DMC had, unbeknownst to plaintiff, been notified by the ACGME on July 2, 2019, that the Program was alleged to be in violation of accreditation requirements.[4] The Program lost its accreditation effective June 30, 2020, whereupon the Program ended. Plaintiff alleges that defendants assisted various male and/or non-Pakistani trainee physicians who had been displaced by the Program's termination to find other placements, but they actively hindered plaintiff's efforts to find a new placement.

Shortly thereafter, plaintiff commenced this action against defendants, alleging breach of contract, discrimination on the basis of national origin, discrimination on the basis of sex, defamation, hostile work environment, retaliation, and intentional infliction of emotional distress. In addition to her discrimination, retaliation, and hostile work environment claims, plaintiff alleges that the settlement agreement was not negotiated in good faith. She argues that defendants knew the Program was facing loss of its accreditation, and the GME agreements expressly provided that the DMC was obligated, among other things, to "[u]se its best efforts, within available resources, to provide an educational training program that" meets accreditation standards and requirements. Plaintiff also argued that the arbitration agreement was invalid. The trial court found that the

---

[4] There is no evidence that Drs. Ham or Mittal were specifically aware of the ACGME notification.

-4-

arbitration agreement was valid and binding as to all of plaintiff's claims, so it granted summary disposition in favor of defendants pursuant to MCR 2.116(C)(7). This appeal followed.

## II. STANDARDS OF REVIEW AND PRINCIPLES OF LAW

A grant or denial of summary disposition is reviewed de novo on the basis of the entire record to determine if the moving party is entitled to judgment as a matter of law. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). Under MCR 2.116(C)(7), where the claim is allegedly barred, the trial court must accept as true the contents of the complaint, unless they are contradicted by documentary evidence submitted by the moving party. *Id*. at 119. "Under MCR 2.116(C)(7), summary disposition is appropriate if a claim is barred because of 'an agreement to arbitrate[.]' " *Altobelli v Hartmann*, 499 Mich 284, 294-295; 884 NW2d 537 (2016) (internal citations omitted).

"Whether a dispute is arbitrable represents a question of law for the courts that we review de novo." *Madison Dist Pub Sch v Myers*, 247 Mich App 583, 594; 637 NW2d 526 (2001). Michigan public policy favors arbitration to resolve disputes. *Rooyakker & Sitz, PLLC v Plante & Moran, PLLC*, 276 Mich App 146, 155; 742 NW2d 409 (2007). However, "an arbitration provision is unenforceable if it is not a binding contract." *Hicks v EPI Printers, Inc*, 267 Mich App 79, 84; 702 NW2d 883 (2005) (citation and quotes omitted). An issue is arbitrable if the parties have an arbitration agreement, the disputed issue is facially or arguably within the scope of the arbitration provision, and the dispute is not expressly exempted from arbitration. *In re Nestorovski Estate*, 283 Mich App 177, 202; 769 NW2d 720 (2009) (quotation marks and citation omitted). "A valid contract requires five elements: (1) parties competent to contract, (2) a proper subject matter, (3) legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation." *Innovation Ventures v Liquid Mfg*, 499 Mich 491, 508; 885 NW2d 861 (2016) (quotation omitted). "[Q]uestions involving the proper interpretation of a contract or the legal effect of a contractual clause are also reviewed de novo." *Rory v Continental Ins Co*, 473 Mich 457, 464; 703 NW2d 23 (2005).

## III. ANALYSIS

Plaintiff generally contends that the arbitration agreement is unenforceable or invalid. We disagree.

## A. VALIDITY OF CONTRACT

Plaintiff does not dispute that she and the DMC were competent to contract or that arbitration was not a proper subject matter for a contract. Rather, she argues that the arbitration agreement was not a binding contract under the circumstances.

Plaintiff contends that the arbitration agreement was inseparable from the FTP policy and the employee handbook, both of which forcefully and unambiguously established that they did not create any kind of employment contract. Plaintiff correctly observes "that an arbitration provision is unenforceable if it is not a binding contract." *Heurtebise v Reliable Business Computers*, 452 Mich 405, 413; 550 NW2d 243 (1996). Thus, if an employee handbook provides that it is not a binding contract, an arbitration provision contained within that handbook is also not binding. *Id*. at 413-414. However, where an arbitration provision is clearly presented as distinct and is

executed separately, the arbitration provision may be binding even if the rest of the handbook is not binding. *Hicks*, 267 Mich App at 83, 87-88.

In other words, there is no inherent reason why an arbitration agreement between an employer and an employee cannot stand alone despite the absence of any other contract of employment. Defendants contend that the arbitration agreement consists of the language that "popped up" at the end of the online training program. The evidence shows that the arbitration agreement at issue here was presented to plaintiff separately, and she was required to agree to it (or decline it) separately.

Plaintiff argues that she had no real choice but to assent, but it would be more accurate to say that she regarded the alternatives as worse. Although understandably frustrating, the evidence shows that plaintiff *did* choose to assent to the agreement, and she did so knowingly and intelligently. Furthermore, even if the arbitration agreement was essentially "take it or leave it," that does not mean the agreement lacked mutuality of obligation. First, the agreement precludes defendants from suing plaintiff in court as much as it precludes plaintiff from suing defendants in court. Secondly, unlike other policy provisions, the arbitration agreement explicitly prohibits defendants from unilaterally altering the terms of the agreement. Cf. *Stewart v Fairlane Community Mental Health Ctr*, 225 Mich App 410, 420; 571 NW2d 542 (1997) ("We cannot conclude that an agreement or provision is mutual or binding where, as between a private employer and a nonunion employee, an employer may unilaterally amend at any time every policy contained in its employee manual.") Consequently, the arbitration agreement was supported by both mutual agreement and mutual obligation. It was valid and enforceable.

## B. SCOPE OF ARBITRATION PROVISION

A fair reading of the arbitration agreement is that its essence is "to submit to final and binding arbitration any and all claims and disputes that are related in any way to [plaintiff's] employment or the termination of [plaintiff's] employment" and that "final and binding arbitration will be the sole and exclusive remedy for any such claim or dispute that [plaintiff] may have against [defendants]." By its plain terms, the arbitration agreement does not cover claims unrelated to plaintiff's employment or the termination that employment. Some of plaintiff's claims, such as defendants' alleged defamation to potential other employers, could arguably appear somewhat attenuated. However, we are required to resolve all doubts in favor of arbitration and to avoid bifurcating parties' claims between a court and an arbitrator. *Rooyakker & Sitz, PLLC*, 276 Mich App at 163. We therefore conclude that the trial court correctly found the arbitration agreement applicable to the entirety of plaintiff's claims.

## C. EXCLUSIONS FROM ARBITRATION

Plaintiff argues that, even if the arbitration agreement was otherwise valid, it does not apply to her employment following her reinstatement, because she did not agree to another arbitration agreement. All other things being equal, we might agree, had there been a true discontinuity in plaintiff's participation in the Program. See *Varma v TCC Wireless, LLC*, 478 F Supp 3d 724,

729-733 (2020).[5] In *Varma*, the court held that the plaintiff's arbitration agreement expired upon his first termination, and because it did not specify that it was everlasting and the plaintiff never executed anything reviving it, the arbitration agreement did not carry over to his second course of employment when he was rehired. *Id.* However, the arbitration agreement in *Varma* applied only to the plaintiff's "employment," whereas the arbitration agreement here applies both to plaintiff's employment and the termination of that employment. Furthermore, in the settlement agreement, plaintiff expressly acknowledged that "she *remains* subject to all applicable policies, practices and procedures of [defendants]" (emphasis added). Although plaintiff argues that defendants did not negotiate the settlement agreement in good faith and that defendants breached the settlement agreement, plaintiff does not appear to be seeking to rescind or void the settlement agreement. By executing the settlement agreement, plaintiff expressly agreed to defendants' then-existing "policies, practices and procedures," which included the arbitration requirements of the FTP.

Plaintiff also argues that the arbitration agreement is not binding because of an irreconcilable conflict between the arbitration agreement and the GME agreements. As noted, the GME agreements, including GME agreements executed *after* the execution of the arbitration agreement, provide, in part, as follows:

> 12.5[[6]] Authority of DMC. The terms of this Agreement are subordinate to the policies and procedures of the DMC as those policies and procedures may change from time-to-time. Nothing in this Agreement will be construed as limiting the authority of DMC from changing policies or procedures or from making any such changes immediately effective. DMC will make reasonable efforts to notify Trainee of changes to its respective policies and procedures that may materially affect a trainee's rights and obligations under this Agreement.

> \* \* \*

> 12.7 Forum. Both Trainee and DMC irrevocably and unconditionally (as) consent to submit to the exclusive jurisdiction of the courts of the State of Michigan for any proceeding arising in connection with this Agreement and (b) waive any objection to the laying of venue of any such proceeding in the courts of the State of Michigan.

The GME agreements are clearly intended to be binding contracts between the parties.

Plaintiff and the DMC subsequently executed additional GME agreements after the arbitration agreement was executed. Each of those GME agreements contained an integration clause. All other things being equal, the integration clauses could be construed as nullifying any

---

[5] Decisions of lower federal courts may be considered persuasive, but they are not binding upon us. *Abela v General Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

[6] The section numbering changed from GME agreement to GME agreement, but these substantive terms did not. For convenience, we are referring to the section numbering used in the 2019-2020 GME agreement.

earlier agreements by the parties that conflict with the terms of the GME agreements. See *Archambo v Lawyers Title Ins Corp*, 466 Mich 402, 413-414; 646 NW2d 170 (2002). However, all other things are not equal, and, as we will discuss, we are unable to conclude that the GME agreements supersede the arbitration agreement under the circumstances of this case.

First, we conclude that the forum-selection clauses in the GME agreements can be harmonized with the arbitration agreement, pursuant to the principle that we should resolve doubts in favor of arbitration. *Rooyakker & Sitz, PLLC*, 276 Mich App at 163. We find persuasive[7] the reasoning of the United States Court of Appeals for the Third Circuit:

> [T]there is nothing inconsistent between the arbitration obligation and the instant forum selection clause. Both can be given effect, for arbitration awards are not self enforceable. They may only be enforced by subsequent judicial action. Thus, even if arbitration is completed, the forum selection clause would appear to dictate the location of any action to enforce the award. [*Patten Sec Corp, Inc v Diamond Greyhound & Genetics, Inc*, 819 F2d 400, 407 (CA 3, 1987) (internal footnote omitted), abrogated in part on other grounds in *Gulfstream Aerospace Corp v Mayacamas Corp*, 485 US 271, 287-288; 108 S Ct 1133; 99 L Ed 2d 296 (1988).]

In other words, the forum selection provision in the GME agreements dictates that any action to enforce an arbitration award, or perhaps to determine whether an arbitrator or arbitration panel exceeded its powers, must be pursued in Michigan courts. However, the forum selection provision does not necessarily dictate whether a particular dispute is, or is not, subject to arbitration.

Secondly, parties are always entitled to alter their contracts or enter into new contracts. *Archambo*, 466 Mich at 412. If any term in a new contract irreconcilably conflicts with a term in the prior contract, the newer contract prevails. *Omnicom of Mich v Giannetti Investment Co*, 221 Mich App 341, 347; 561 NW2d 138 (1997). The parties' first contract was the first GME agreement, which did not contain an arbitration provision. However, the arbitration agreement was unquestionably a new contract entered into by the parties after plaintiff and the DMC executed plaintiff's first GME agreement. Even if we were to find that the arbitration agreement irreconcilably conflicted with a term in the first GME agreement, which we do not, the arbitration agreement would necessarily supersede any such conflicting term in the GME agreement.

Finally, the forum selection clause in the GME agreements is limited to "any proceeding arising *in connection with this Agreement*." It is therefore significantly narrower in scope than the arbitration agreement. In other words, the arbitration agreement remains applicable to any claim "related in any way" to plaintiff's employment or termination, and the GME agreements would at most carve out an exception for proceedings specifically arising out of the GME agreement itself. Presuming it is even possible to concretely identify which claims would and would not remain subject to arbitration, which is somewhat doubtful, bifurcating claims in such a manner directly conflicts with public policy favoring arbitration. *Rooyakker & Sitz, PLLC*, 276 Mich App at 163.

---

[7] See footnote 5.

Pursuant to § 12.5 of the GME agreements,[8] the GME agreements were expressly subject to defendants' existing policies and procedures, which included arbitration.

     Affirmed.

/s/ Mark T. Boonstra
/s/ Amy Ronayne Krause
/s/ Thomas C. Cameron

---

[8] We note that § 12.5 refers to policies and procedures "as those policies and procedures may change from time-to-time."  We note that if defendants could overturn the terms of the GME agreements and evade their contractual obligations at will by unilaterally altering their policies and procedures, the GME agreements might arguably be a sham.  See *Karr v Bd of Trustees of Mich State Univ*, 119 Mich App 1, 6; 325 NW2d 605 (1982); see also *Stewart*, 225 Mich App at 420, and *Carlson v Johnson*, 275 Mich 35, 37; 265 NW 517 (1936).  However, because the arbitration policy was effectuated by way of a contractual agreement, we need not consider the significance of the "as those policies and procedures may change from time-to-time" language.